IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTINA METTIAS, Individually and as Next Friend of Her Minor Son N.M., | ) Civ. No. 12-00527 ACK-KSC )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | )<br>)<br>) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

### SYNOPSIS

On April 1, 2014, Plaintiff Christina Mettias ("Christina") filed an Amended Complaint on behalf of herself and her minor son N.M. (together, "Plaintiffs") against Defendant, the United States of America ("the Government"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.* (Doc. No. 68.) Plaintiffs assert claims of medical negligence, failure to obtain informed consent, negligent infliction of emotional distress, and loss of consortium in connection with a Roux en Y gastric bypass surgery that Christina underwent on September 27, 2010 at Tripler Army Medical Center ("Tripler"), which is owned, operated, and controlled by the United States.

For the reasons set forth herein, the Court finds and concludes that the Tripler providers breached the applicable

standard of care by offering Christina the gastric bypass surgery notwithstanding the fact that she did not meet the eligibility criteria that represented the prevailing standard of conduct in the applicable medical community. The Court further finds and concludes that the Tripler providers failed to give Christina sufficient and adequate information such that she was able to give her informed consent to the procedure. Thus, for the reasons discussed herein, and as set forth below, the Court finds and concludes that judgment in favor of Plaintiffs and against the United States is appropriate in the amount of $4,150,307 to Plaintiff Christina Mettias, and $100,000 to Plaintiff Christina Mettias as next friend of her minor son, N.M.

A 13-day bench trial was commenced on February 24, 2015, and completed on March 16, 2015. Having heard and weighed all the evidence and testimony adduced at the trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard the arguments of counsel and considered the memoranda submitted, and pursuant to Fed. R. Civ. P. 52(a)(1), this Court makes the following findings of fact and conclusions of law. Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

**TABLE OF CONTENTS**

FINDINGS OF FACT                                                  4

I.    Jurisdiction and Venue                                      4

II.   Background: Roux En Y Gastric Bypass Surgery                5

III.  The Applicable Standard of Care Regarding Patient
      Eligibility for Bariatric Surgery                           7

      A.    The First Prong: BMI Criterion                       14

      B.    The Second Prong: Prior Weight Loss Attempts         21

IV.   The Tripler Bariatric Surgery Program                      28

V.    Christina's Course of Care at Tripler                      31

      A.    Christina's Personal and Medical History             31

      B.    Christina's Referral to the Bariatric
            Surgery Program                                       35

      C.    Christina's Enrollment and Participation
            in Tripler's Bariatric Surgery Program               37

      D.    The Preoperative Meeting with Dr. Payne              47

      E.    The Day of Surgery                                   50

VI.   Christina's Post-Surgery Complications                     56

CONCLUSIONS OF LAW                                               69

I.    The FTCA and Vicarious Liability                           69

II.   Medical Negligence                                         70

III.  Informed Consent                                           76

IV.   Negligent Infliction of Emotional
      Distress as to N.M.                                        81

V.    Loss of Parental Consortium                                82

VI.   Damages                                                    83

DECISION                                                         86

## FINDINGS OF FACT

### I.   Jurisdiction and Venue

1. This Court has jurisdiction under the FTCA, and venue is proper, as the events that gave rise to this action occurred within this district. See 28 U.S.C. §§ 1346(b), 1391(e)(2).

2. Pursuant to the provisions of the FTCA, Plaintiffs filed administrative claims on November 3, 2011, for personal injury against the United States of America within the statutory period as required by law. The Government acknowledged receipt of the FTCA claims forms on November 22, 2011, and Plaintiffs filed their original Complaint on September 24, 2012. As of September 24, 2012, Defendant United States had not taken final administrative action on the Plaintiffs' claims. Therefore, Plaintiffs duly exhausted all administrative procedures and the Complaint was timely filed.

3. Plaintiffs' Amended Complaint was filed on April 1, 2014. On October 14, 2014, the Court entered its Order Denying Defendant's Motion to Dismiss as to Plaintiffs' Informed Consent Claim, holding that Plaintiffs had exhausted their administrative remedies as to their informed consent claim and that the Court thus has subject-matter jurisdiction over Plaintiffs' informed consent claim. (Doc. No. 106.) Plaintiffs have therefore duly exhausted all administrative procedures and the Amended Complaint

was timely filed.

**II.  Background: Roux En Y Gastric Bypass Surgery**

4. Bariatric surgery is a type of weight loss surgery. The procedure at issue in the instant case that was performed on Christina on September 27, 2010, was a laparoscopic Roux en Y gastric bypass surgery. Roux en Y gastric bypass is the most invasive of the various weight loss surgeries, and has the highest degree of risk. (Ex. J4 at 4.) It also tends to produce the greatest reduction in weight. (Id.) In the normal digestive tract, food passes down the esophagus, through the stomach and into the small intestine, where most of the nutrients and calories are absorbed. The food then passes into the large intestine, and is finally excreted as waste. In a Roux-en-Y gastric bypass, a small part of the stomach is separated surgically, often by use of staples, to create a new stomach pouch, approximately the size of a plumb. The small intestine is then cut in its middle portion in an area called the jejunum, and the lower end of the small intestine is then brought up through the abdomen and connected to the newly created stomach pouch, thereby bypassing the majority of the stomach and the upper portion of the small intestine. (Ex. J5; Leitman: 4-65–68; Ernsberger: 7-34; Ex. 245.)

5. According to Dr. Robert Lim, the head of Tripler's Bariatric Surgery Program at the time of Christina's surgery,

5

there is an overall complication rate for bariatric surgery of twenty percent. (Lim 9/4/13 (Ex. 355) at 64-65.) The medical literature appears to echo this complication rate. (Ex. 1031 (2008 SAGES Guidelines) at 13/31; Ex. 273 (2013 Jones Article) at 008443.)

6. Even when successful, Roux En Y gastric bypass surgery leaves the patient with a compromised digestive system that by design causes malnutrition and malabsorption, and therefore requires lifelong dietary restrictions, nutritional supplements, and medical follow up. (Leitman: 4-66-67; Ernsberger: 7-34-36; Ex. 119 at 13; Ex. 1163.) The language of the patient eligibility standards, along with the testimony of experts in the field, therefore make clear that weight loss surgery is not a "first-line" treatment. (Leitman: 4-68-69, 4-160; Ernsberger: 7-33; Jones: 8-97; Verschell: 12-120.)

7. Although randomized, high quality data on the long-term outcomes of weight loss surgery are lacking, (Jones: 9-21,) some data suggests that, while initial weight loss after surgery can be impressive, many patients experience weight regain after the first few years following surgery. For example, the Swedish Obesity Study found that the mean sustained weight loss for gastric bypass patients at ten years after surgery was 25% to 26% of initial weight, that about one-quarter of patients sustained less than 20% weight loss, and that 9% of patients sustained less

than 5% weight loss. (Ex. 273 at 008443-8444; Leitman: 4-135; Jones 9-21.) On the other hand, there is also evidence that "[w]eight-loss surgery is the most effective treatment for morbid obesity, producing durable weight loss, improvement or remission of comorbid conditions, and longer life." (Ex. 1031 (SAGES Guidelines) at 3; Jones: 8-109.)

## III. The Applicable Standard of Care Regarding Patient Eligibility for Bariatric Surgery

8. Patient eligibility standards for bariatric surgery were developed as part of a multidisciplinary effort that included nutritionists, psychologists, public health officials, and bariatric surgeons. These patient eligibility criteria represent an attempt by the medical community to establish the threshold at which the risks of bariatric surgery likely outweigh the benefits. (Ex. J4 (1991 NIH Consensus Statement) at 1; Ex. 119 (Leitman Report) at 14.)

9. The liability experts on both sides of the instant case, as well as Dr. Lim, the witness designated as most knowledgeable regarding the Tripler Bariatric Surgery Program under Rule 30(b)(6) of the Federal Rules of Civil Procedure, all agree, and the Court so finds, that there is a patient eligibility standard that must be met before bariatric surgery may be performed on a patient. (Leitman: 4-24, 4-160; Jones: 8-37; Ernsberger: 7-57-58; Lim 9/4/13 (Ex. 355) at 29-32.)

10. The liability experts on both sides of the instant

case, as well as Dr. Lim, all also agree that the applicable

national standard for patient eligibility for bariatric surgery

was first set forth in 1991 in the National Institutes of Health

("NIH") Consensus Statement. (Ex. 1042 (Jones Report) at 5; Ex.

119 (Leitman Report) at 14-15; Lim 9/4/13 (Ex. 355) at 28-29; see

also Ex. J4 (NIH Consensus Statement).) The NIH Consensus

Statement includes the following recommendations:

> A decision to use surgery requires assessing the
> risk-benefit ratio in each case. Those patients
> judged by experienced clinicians to have a low
> probability of success with nonsurgical measures,
> as demonstrated for example by failures in
> established weight control programs or reluctance
> by the patient to enter such a program, may be
> considered for surgery.
>
> A gastric restrictive or bypass procedure should
> be considered only for well-informed and motivated
> patients with acceptable operative risks. The
> patient should be able to participate in treatment
> and long-term follow-up.
>
> Patients whose BMI[1] exceeds 40 are potential
> candidates for surgery if they strongly desire
> substantial weight loss, because obesity severely
> impairs the quality of their lives. They must

---

[1] The acronym "BMI" was used extensively at trial. "BMI"
refers to "body mass index," which is a calculation that reflects
an individual's relative size based on the individual's mass (or
body weight) and height. The BMI for an individual is defined as
their body mass divided by the square of their height, with the
value universally being given in units of $kg/m^2$. There are BMI
calculators readily available on-line. See, e.g., National
Institutes of Health, Calculate Your Body Mass Index, available
at http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI. At
all relevant times, the Tripler electronic medical record system
automatically computed and entered a patient's BMI when the
patient's height and weight were recorded as designated chart
entries. (Williams: 1-62-63; Lim 09/04/13 (Ex. 355) at 36.)

> clearly and realistically understand how their
> lives may change after the operation.
>
> In certain instances less severely obese patients
> (with BMIs between 35 and 40) may also be
> considered for surgery. Included in this category
> are patients with high-risk comorbid conditions
> such as life-threatening cardiopulmonary problems
> (e.g., severe sleep apnea, Pickwickian syndrome,
> and obesity related cardiomyopathy) or severe
> diabetes mellitus. Other possible indications for
> patients with BMIs between 35 and 40 include
> obesity-induced physical problems interfering with
> lifestyle (e.g., joint disease treatable but for
> obesity, or body size problems precluding or
> severely interfering with employment, family
> function, and ambulation).

(Ex. J4 at 5.)

11. The Abstract to the NIH Consensus Statement states that the panel recommended that "patients seeking therapy for severe obesity for the first time should be considered for treatment in a nonsurgical program with integrated components of a dietary regimen, appropriate exercise, and behavioral modification and support [and that bariatric surgery] could be considered for well-informed and motivated patients with acceptable operative risks . . .." (Id. at 2.). The NIH Consensus Statement also noted: "The possibility should not be excluded that the highly motivated patient can achieve sustained weight reduction by a combination of supervised low-calorie diets and prolonged, intensive behavior modification therapy." (Id. at 4.)

12. Since publication in 1991, the patient eligibility

criteria in the NIH Consensus Statement have been interpreted and
applied by numerous health care providers involved in the
management of obesity. The Court has reviewed a number of
documents that incorporate and apply the NIH Consensus Statement,
including position statements and clinical guidelines
promulgated by professional medical associations (specifically,
those promulgated by the American Society of Metabolic and
Bariatric Surgeons ("ASMBS"), the Society of American
Gastointestinal and Endoscopic Surgeons ("SAGES"), the American
College of Physicians, the American Dietetic Association, the
National Heart, Lung and Blood Institute, and the Society for
Surgery on the Alimentary Tract ("SSAT")); documents setting
forth the coverage criteria for weight loss surgery promulgated
by public and private third party payers; and hospital websites
listing patient eligibility qualifications for weight loss
surgery. (See Exs. 1029 (ASMBS Guidelines), 1031 (SAGES
Guidelines), 247 (Lenox Hill Hospital Website), 254 (Final Rule:
Tricare Reimbursement for Bariatric Surgery), 341 (Kaiser
Reimbursement for Bariatric Surgery); Jones: 8-79-83, 8-90-91, 8-
124-127, 8-128-136.) The Court finds that all of these documents
are helpful in understanding and determining the standard of care
that existed in 2010 for patient eligibility for weight loss
surgery. No one document, however, is determinative of the
standard of care.

13. The ASMBS articulates the qualifications for bariatric surgery as a BMI of greater than or equal to 40 with no comorbidities (or between 35 and 40 and at least two obesity-related comorbidities), and an "[i]nability to achieve a healthy weight loss sustained for a period of time with prior weight loss efforts." (Ex. 1029.) The Court notes that the ASMBS appears to be the sole professional association devoted exclusively to weight loss surgery and comprised primarily of bariatric surgeons and other health care professionals. Nevertheless, the ASMBS guidelines are merely one of a number of sources the Court must consider in determining the standard of care. (Leitman 4-156.)

14. The Court notes that the 2008 SAGES "Guidelines for Clinical Application of Laparoscopic Bariatric Surgery," endorsed by the ASMBS, contains a disclaimer stating that the guidelines are not intended to establish a legal standard of care, and that they are "intended to be flexible, as the surgeon must always choose the approach best suited to the patient and to the variables at the moment of decision." (Ex. 1031 at 2.) Importantly, however, the SAGES Guidelines make clear that deviation from the general eligibility criteria set forth in the guidelines should be based upon some clinical rationale, for example, "the condition of the patient, limitations on available resources or advances in knowledge or technology." (Id.) Indeed, Dr. Jones testified that a departure from the articulated

criteria would require "some kind of reason . . . [i]t's not just arbitrarily decided to depart," and that doctors must "justify the [departure] in some way." (Jones: 8-130-131.)

15. In addition to the guidelines of professional organizations, the Court also finds relevant, albeit not determinative, the Tricare coverage criteria developed by the Department of Defense ("DOD"). The Tricare coverage criteria for bariatric surgery were developed between October of 2009 and March of 2011, and state that Tricare coverage is limited to those procedures "for which the safety and efficacy has been proven comparable or superior to conventional therapies and is consistent with the generally accepted norms for medical practice in the United States medical community." (Ex. 254 at 008115.) As is relevant here, the Tricare conditions of coverage for bariatric surgery require that a patient without comorbidities must have a BMI of greater than or equal to 40 and must have "previously been unsuccessful with medical treatment for obesity." (Id.)

16. In determining the standard of care for patient eligibility for bariatric surgery, the Court has also weighed the testimony of the two primary liability experts retained by the parties, Dr. Leitman and Dr. Jones. The Court finds both experts to be highly qualified to provide expert opinions under Rule 702 of the Federal Rules of Evidence.

17. The Court found Dr. Leitman's testimony to be direct, responsive, and credible.

18. The Court generally found Dr. Jones's testimony to be informed and usually, although not always, responsive. The Court has some concern, however regarding Dr. Jones's credibility. The Court notes the apparent conflict of interest in Dr. Jones offering opinions in a case involving the bariatric surgery program over which Dr. Lim has direct responsibility. Dr. Lim completed a fellowship with Dr. Jones immediately prior to his employment as the head of the Tripler Bariatric Surgery Program, Dr. Jones and Dr. Lim have co-authored numerous articles and books together, and it was Dr. Lim who suggested Dr. Jones be retained as an expert in this case. (Jones: 8-10-12.) While this conflict was clearly disclosed to the Court, it does bear on Dr. Jones's credibility and, thus, the weight afforded to his testimony.

19. After having reviewed the NIH Consensus Statement and all of the relevant guidelines and documents interpreting and applying that Consensus Statement, and hearing testimony from both parties' experts, the Court concludes that, for purposes of the instant case, the standard of care for patient eligibility for gastric bypass surgery at the time of Christina's surgery involved two essential inquiries, or "prongs." Although these two prongs are not the only considerations relevant to the

appropriateness of surgery, they are the two that are directly implicated in the instant suit. (Ex. 119 (Leitman Report); Jones: 8-170.) The Court addresses each below.

**A.    The First Prong: BMI Criterion**

20. The liability experts of both parties, as well as Dr. Lim, all agree, and the Court therefore finds, that the first prong of the patient eligibility standard of care required that Christina have a BMI of 40 or above (given the undisputed fact that she had no obesity-related comorbidities at any relevant time) in order to be an appropriate candidate for bariatric surgery. (Lim 9/4/13 (Ex. 355) at 28-30, 38; Leitman: 4-21-22; Jones: 8-39.)

21. The BMI eligibility requirement represents "an attempt to balance the risk of a surgical procedure against the potential to either correct or prevent the consequences of prolonged obesity." (Payne: 2-118.) Thus, it reflects a judgment by the medical community that the risks of weight loss surgery outweigh its benefits when it is performed on a patient who has a BMI of less than 40 and no obesity-related comorbidities. (Payne: 2-120-121; Leitman: 4-24.) The experts and other witnesses dispute, however, when the relevant BMI measurement should occur. (See, e.g., Payne: 2-120-121.)

22. Dr. Jones, the Government's expert in bariatric surgery, opined that the BMI criterion was required to be applied

14

only when Christina entered Tripler's Bariatric Surgery Program in March of 2010, and it need not have been revisited - at least for purposes of surgery eligibility - again. (Jones: 7-136, 7-138; Ex. 1042 (Jones Report).)

23. Dr. Leitman, Plaintiffs' expert in bariatric surgery, opined that the BMI criterion was required to be applied continuously until the time of surgery, including on the date Christina was determined to be an appropriate candidate for surgery, as well as on the actual day of surgery. (Leitman: 4-21-23, 4-49, 4-171-172; Ex. 119 (Leitman Report).)

24. Dr. Ernsberger, Plaintiffs' expert in obesity management, agreed with Dr. Leitman that Christina should have been told she was no longer eligible for surgery when she did not meet the BMI criterion on September 14, 2010, the date of her pre-surgical meeting with Dr. Payne, her surgeon. (Ernsberger: 7-67; Ex. 121.)

25. Dr. Jones's opinion is apparently based upon his own experience. When asked during cross-examination whether there exists any medical authority that explicitly addresses the issue of when the BMI criterion should be applied, Dr. Jones initially cited an article published in 2008 or 2009 in the journal *Surgery for Obesity and Related Diseases*; however, Dr. Jones later admitted that the article did not, in fact, include any language supporting his opinion that the BMI criterion could be applied

upon entry into a bariatric surgery program. (Jones: 8-154-155.)

26. Dr. Jones also pointed to a position statement from the International Federation for the Surgery of Obesity and Metabolic Disorders ("IFSO") to support his contention that surgery is not inappropriate where a patient's BMI falls below 40 after entry into a bariatric surgery program. Specifically, the IFSO position statement states that a lower BMI "as a result of intensified treatment before surgery . . . is not a contraindication for the planned bariatric surgery." (Jones: 9-56-57.) The weight of the position statement is undermined, however, as it has never been adopted by the ASMBS or any other professional organization in the United States. (Id. 9-64-65.)

27. The Department of Defense's final rule regarding Tricare reimbursement for bariatric surgery stated in response to a public comment regarding the laproscopic adjustable gastric banding surgical procedure that coverage "is contingent upon the patient meeting Tricare morbid obesity policy criteria at the time of his or her surgery." (Ex. 254 at 008113.) As noted above, the "morbid obesity policy criteria" include the requirement that the patient's BMI be equal to or exceed 40. (Id. at 008115.)

28. The Court finds no medical literature (other than the IFSO position statement) has been presented which establishes that the BMI criterion need only be applied as of the date the patient enters the bariatric surgery program.

29. The Court finds significant the fact that all of the hospital webpages reviewed during the course of trial (including those for Beth Israel Deaconess Hospital (where Dr. Jones works), Lenox Hill Hospital (where Dr. Shah and Dr. Leitman have worked), and Kaiser Permanente (where Dr. Payne has worked)) express the BMI criterion as a qualification for surgery, and not as a qualification for acceptance into a bariatric surgery program. (Jones: 8-128-137; Ex. 351 (Lenox Hill Website); Ex. 341 (Kaiser Website).) The Court notes, however, that Dr. Jones testified that the websites set forth the criterion as such to inform patients as to what most insurance companies require for coverage. (Jones: 8-130, 8-132.)

30. The Court finds problematic the fact that, under Dr. Jones's asserted interpretation of the BMI criterion, an interval of several years may pass between the BMI assessment at entry into the bariatric surgery program and the actual date of surgery. (Jones: 8-159-160.)

31. The Court is likewise troubled by the Government witnesses' statements that, so long as a patient meets the BMI criterion at the time of entry into the bariatric program, any subsequent fall in her BMI would not typically disqualify her for surgery. For example, Dr. Jones testified that a patient would not be disqualified from surgery unless her BMI fell below 30 prior to surgery. (Jones: 8-160-161.) Dr. Jones explained that

17

patients should not be penalized if they have success losing some weight through diet and exercise undertaken in preparation for surgery. (Jones: 8-162-163, 8-165-167.) Further, Dr. Jones asserted that 95% of obese people will typically regain any weight they may lose without surgical intervention. (Id. at 8-89-90.) Dr. Jones also testified that preoperative weight loss may actually improve surgical outcomes by decreasing the size of the liver and teaching the patient how to comply with postsurgical dietary restrictions. (Jones: 7-154-155.) Similarly, Dr. Payne asserted that a patient whose BMI fell to 29 during the course of the preoperative program would not be disqualified from surgery. (Payne: 2-125.) He testified that this would be the equivalent of making patients comply with preoperative requirements and then "pull[ing] the rug out from under them just because they've been successful . . .." (Id. at 2-123.) Nevertheless, the Court finds that an approach wherein preoperative lowering of the BMI will not disqualify a patient from eligibility undermines the risk-benefit analysis on which the patient eligibility BMI criterion is based.

    32. The Court heard testimony during trial regarding the Code Sheet used to document Christina's gastric bypass surgery performed on September 27, 2010. (Ex. J1 at 001138.) The Code Sheet was not used to obtain payment for Christina's surgery because she was a military dependent; however, it was Tripler's

practice to generate such a form for every inpatient admission at the hospital. (Thompson 12/23/14 (Ex. 359) at 25-26.) Plaintiff's "principal diagnosis" "present on admission" was coded as "morbid obesity" on September 27, 2010. (Ex. J1 at 001138.) Morbid obesity is generally defined as a BMI of 40 or greater, or 35 or greater with comorbidities. (Leitman: 4-27; Ernsberger: 7-67.) The Court finds that Plaintiff did not meet the definition of "morbidly obese" on the day of surgery, as her BMI was 35.8 on that date and it is undisputed that she did not have any obesity-related comorbidities. (Ex. J1 at 001152; Payne: 2-173-174; Leitman: 4-38, 4-132-134; Ernsberger: 7-66.)

33. There was some testimony at trial that, because Christina's ethnic background was Hispanic and Samoan, surgery may have been appropriate at a slightly lower BMI. (See Jones: 7-156, 8-88, 8-146; Ex. 1008 at 000599.) There was no testimony or other evidence, however, indicating that the Tripler doctors relied upon Christina's ethnicity as a rationale for departing from the BMI eligibility criterion.

34. In the context of third party payors, weight loss surgery would only be reimbursable if the relevant code sheet reflected a diagnosis of morbid obesity on the date of surgery, making the date of surgery the relevant date for purposes of the BMI eligibility assessment. (Leitman: 4-165-166.) The testimony regarding the practices of third party payors therefore

undermines Dr. Jones's testimony that it is the standard practice of physicians to perform bariatric surgery on patients who do not meet the definition of morbid obesity, and thus do not meet the BMI criterion at the time of surgery.

35. Moreover, the Court finds that Dr. Jones's credibility is undermined somewhat by his testimony that he had never considered the issue of the timing of the BMI eligibility assessment prior to being retained as an expert in this case, notwithstanding his testimony that he was aware that insurance companies sometimes deny coverage for patients who fall below the BMI criterion because of presurgical weight loss. (Jones: 9-72-73.)

36. Considering all the evidence before it, the Court finds and concludes that, for purposes of the standard of care for bariatric surgery as established by the prevailing standards of conduct in the applicable medical community, the first prong of the patient eligibility standard requires that the BMI criterion be applied at the time the patient is determined to be an appropriate candidate for bariatric surgery, and continually thereafter until the time of surgery. In making this finding, the Court relies upon Dr. Leitman and Dr. Ernsberger's expert testimony and the language of the NIH Consensus Statement and the various guidelines interpreting that document, as well as the other submitted evidence. The NIH Consensus Statement and the

subsequent guidelines promulgated by professional organizations all evinced an intent to establish a BMI level below which the risks of surgery outweigh its potential benefits. The Court concludes that the expert testimony and the aforementioned authorities establish the standard of care that the assessment of whether a patient is below or above this BMI level (as is relevant here, a BMI of 40 or above) must be done at the time the determination is made that a patient is an appropriate candidate for surgery and continually thereafter until the time of surgery, rather than at some prior point months or even years beforehand. The Court notes that Dr. Jones testified that applying the BMI criterion on the day of surgery could lead to chaotic results; however, this concern should be alleviated if at the preoperative meeting shortly before a scheduled surgery it appears that a patient may not meet the BMI requirement, as the hospital would at that point be on notice that it may need to reassess the appropriateness of surgery.

**B.    The Second Prong: Prior Weight Loss Attempts**

37. The second prong of the patient eligibility standard for bariatric surgery involves an assessment of whether a patient has made any prior nonsurgical weight loss attempts.

38. Dr. Leitman testified that the applicable standard of care requires that a patient have tried and failed a "medically supervised" weight loss program prior to being deemed

an appropriate candidate for bariatric surgery. (Leitman: 4-40-41; Ex. 119 (Leitman Report).) Similarly, Dr. Ernsberger testified that bariatric surgery should only be offered after "the failure of multiple serious and medically [] supervised attempts at losing weight." (Ernsberger: 7-34.)

39. Dr. Lim appeared to agree with Dr. Leitman and Dr. Ernsberger. Specifically, Dr. Lim testified that, before a patient could be considered for weight loss surgery at Tripler, the patient must have attempted some medical weight loss program. (Lim 9/4/13 (Ex. 355) at 31-32.) Further, Dr. Lim acknowledged that a document titled "Weight Loss Surgery: Is It Right for You?" that was given to Tripler Bariatric Surgery Program patients included the statement that surgery "should only be considered if [the patient had] failed all medical weight loss options and [felt] that any further non-surgical attempts would be futile." (Id. at 71; Ex. J5.) Dr. Lim confirmed that this statement was consistent with the standards for entry into the Tripler Bariatric Surgery Program. (Lim 9/4/13 (Ex. 355) at 71.)

40. Dr. Verschell, the head of Tripler's LEAN Healthy Lifestyles Program, also testified that one of the criteria for entry into Tripler's Bariatric Surgery Program was that the patient "had made a reasonable effort at a weight loss attempt and not been successful." (Verschell: 10-196-97.) Dr. Verschell stated that "it doesn't have to be a formal program[,]" but that

patients must have tried some form of supervised nonsurgical weight loss program: "It could be that they were working with, for instance, closely with their primary care doctor or a dietician, but some type of health care professional, with regard to making sure that they're getting appropriate advice with regard to how to achieve weight loss." (Id. at 10-199-200.) Dr. Verschell summarized by stating that it "is the standard protocol" that "patients should be getting professional counseling with regard to how to go about achieving weight loss in an effective way." (Id. at 10-200.)

41. During the course of the trial, the Court also reviewed statements regarding the second eligibility prong made in clinical guidelines and position statements issued by professional organizations, in the coverage criteria of third party payors, and on hospital websites. These included clinical guidelines and position statements from the NIH, ASMBS, SAGES, SSAT, the American College of Physicians, the American Diatetic Association, and the National Heart, Lung and Blood Institute. They also included the Depart of Defense's Tricare coverage criteria and the DoD/Veterans Administration Clinical Practice Guideline, as well as the websites of the hospitals where Dr. Jones, Dr. Shah, Dr. Payne, and Dr. Leitman performed bariatric surgery. (See Exs. 1029 (ASMBS Guidelines), 1031 (SAGES Guidelines), 247 (Lenox Hill Hospital Website), 254 (Final Rule:

Tricare Reimbursement for Bariatric Surgery), 341 (Kaiser
Reimbursement for Bariatric Surgery); Ex. 121 (Ernsberger
Report); Jones: 8-79-83, 8-90-94, 8-124-127, 8-128-136;
Ernsberger: 7-44.) All of these sources articulated the second
eligibility prong as requiring that the patient have failed in
prior, nonsurgical weight loss attempts. For example, as noted
above, the ASMBS guidelines state the second eligibility prong as
follows: "Inability to achieve a healthy weight loss sustained
for a period of time with prior weight loss efforts." (Ex. 1029.)

    42. Similarly, the Court reviewed a statement published
on the Kaiser Permanente website addressing the second prong, and
stating that, in order to be eligible for surgery, a patient must
have "completed a medically supervised weight loss program within
the last two years[,]" and "have been morbidly obese for at least
3 of the last 5 years . . . documented by a physician . . .."
(Ex. 341 at 009128.)

    43. Moreover, a chapter in a 2009 book edited by Dr.
Jones (Obesity Surgery: Patient Safety and Best Practices)
contains a similar formulation of the second prong. Specifically,
the chapter states that "therapy combining low calorie diet,
increased physical activity, and behavioral treatment is the most
successful strategy for weight loss and weight maintenance . . ..
This kind of lifestyle intervention should be attempted with the
patient for at least six months before considering any type of

drug treatment or surgical treatment." (Jones: 8-87.) The Court
notes that Dr. Jones testified that he had not read this chapter
before publishing it in his book (that he merely moderated the
conference from which the book materials were gleaned), and that
he was not familiar with it, nor did he agree with it. (Id. at 8-
85-87, 8-90-91.)

44. Dr. Jones is the only witness to testify at trial
who disagreed that the standard of care required that a patient
must have tried nonsurgical weight loss attempts prior to being
offered bariatric surgery. Dr. Jones opined that patients must
have tried "behavior modifications, diet and exercise prior to
surgery," but that these nonsurgical options may be initiated
after a patient joins a bariatric program if they have not been
tried before. (Jones: 8-118.) Dr. Jones also disagreed that a
patient needs to have "failed" prior weight loss attempts to be
eligible for surgery; rather, Dr. Jones asserted that the patient
needs to be successful in preoperative weight loss through the
bariatric surgery program in order to be a good candidate for
surgery. (Id. at 8-110-111.) Dr. Jones asserted that 95% of obese
people typically regain any weight they may lose without surgical
intervention. (Id. at 8-89-90.) Dr. Lim also testified that most
patients who lose weight typically regain that weight and are
unable to keep it off. (Lim 9/4/13 (Ex. 355) at 39-40.)

45. The Court notes that Dr. Jones's testimony

regarding the second eligibility prong is at odds with the language on the website for his own hospital, the Beth Israel Deaconess Medical Center. Specifically, the website states that, to be a candidate for weight loss surgery, a patient must "have failed to lose weight through medical diets and exercise," and that weight loss surgery may be appropriate if a patient's "serious attempts to lose weight have had only short-term success." (Jones: 8-135.) The website also states that weight loss surgery may be a good option for "seriously obese patients who have been unsuccessful in nonsurgical weight loss methods such as diets, medications, behavior modification or exercise programs . . .." (Jones: 8-136.)

46. The Court finds that Dr. Jones's opinions regarding the second prong of the patient eligibility criteria are inconsistent with the weight of evidence before the Court, including the clinical guidelines and position statements of numerous professional associations, and the testimony of the other medical professionals.

47. Based on the weight of the evidence before the Court, including the clinical guidelines and position statements of numerous professional associations, and the testimony of Dr. Lim, Dr. Verschell, Dr. Leitman, and Dr. Ernsberger, the Court finds that the applicable standard of care for bariatric surgery, as established by the relevant medical community, requires that a

patient must have failed in prior attempts at nonsurgical weight loss in order to be eligible as an appropriate candidate for bariatric surgery.

48. As to what types of prior weight loss efforts would satisfy the second eligibility prong, Dr. Leitman opined that the prior weight loss effort must be "medically supervised." (Leitman: 4-43.) The Court notes, however, that many of the clinical guidelines and position statements the Court reviewed during the course of the trial have no such requirement. (See, e.g., Ex. 1029 (ASBMS Guidelines); Ex. 1031 (SAGES Guidelines); Jones: 8-83 (American College of Physicians Guideline); Jones: 8-126 (SSAT Guideline); Jones: 9-56-57 (IFSO article).) In addition, Dr. Verschell and Dr. Smiley both disagreed that prior weight loss attempts must be "medically supervised." (Verschell: 10-201; Smiley: 2-52.)

49. The Court concludes that it need not reach the question of whether the second eligibility prong specifically requires prior weight loss attempts to be "medically supervised." Rather, the Court finds that the second eligibility prong requires, at a minimum, that a patient must have failed a formal weight loss program of some kind, whether characterized as medically supervised or as an adequate trial of nonsurgical weight loss.

50. With respect to the assessment and verification of

prior weight loss efforts, Dr. Leitman and Dr. Jones both testified that this would involve taking a medical history from the patient and subsequently reviewing the patient's medical records. (Leitman: 4-39; Jones: 9-10-12.) Dr. Shah echoed this testimony, stating that he takes a thorough medical history and reviews the patient's medical records to the extent they are available. (Shah: 4-207-208.) The Court therefore finds that the applicable standard of care requires that a full and complete medical history be taken that includes specific questions about a patient's past weight loss attempts, and that past medical records be reviewed, if possible, to verify the patient's responses.

## IV.  The Tripler Bariatric Surgery Program

51. Active duty military members are prohibited from receiving bariatric surgery; however, military dependants such as Christina may have the surgery at no charge provided it is performed at a Military Treatment Facility such as Tripler. (Wodartz 5/8/14 (Ex. 361) at 30.)

52. Nurse Yvette Williams was hired as the Bariatric Nurse Coordinator for the Tripler Bariatric Surgery Program in November of 2008, and continued in that position until August of 2012. (Williams: 1-34.)

53. Dr. Robert Lim was hired to run the Tripler Bariatric Surgery Program in July of 2009, and sought to make

Tripler a Center of Excellence, which required, *inter alia*, implementation of a multidisciplinary approach and an increase in the number of bariatric surgeries performed at Tripler. (Lim 9/4/13 (Ex. 355) at 13-14, 19.)

54. As part of his effort to achieve Center of Excellence status for Tripler, Dr. Lim (along with Nurse Williams) made presentations about the program at a number of primary care clinics, telling primary care providers that, even if they were uncertain whether patients qualified for surgery, the patients were welcome to attend an Information Session. (Id. at 25.)

55. Dr. Lim testified that Tripler followed "accepted practice in the community" in making eligibility determinations for bariatric surgery, including by following the NIH Consensus Statement and the guidelines subsequently promulgated by the ASMBS and SAGES. (Id. at 22, 28-30.) Dr. Lim stated that, accordingly, prior to acceptance into the Tripler Bariatric Surgery Program, patients had to have a BMI of over 40 (or over 35 with comorbidities), and had to have attempted some nonsurgical weight loss program. (Id. at 25, 30-32, 71.) Nurse Williams echoed Dr. Lim's testimony regarding the eligibility requirements of the Tripler Bariatric Surgery Program. (Williams: 1-48-49, 1-72.) Likewise, Dr. Mark Verschell and Dr. Nancy Smiley both also confirmed these requirements for entry into the

program. (Verschell: 10-199-201; Smiley: 2-46, 1-166.)

56. Based on the testimony of the Tripler providers, the Court finds that there were two primary criteria used at Tripler in 2010 to screen patients for eligibility for entry into the Tripler Bariatric Surgery Program: (1) the patient must have a BMI of 40 or above with no comorbidities, or 35 or above with comorbidities; and (2) the patient must have failed "all medical weight loss options and [must feel] that any further non-surgical attempts would be futile." (Ex. J5.)

57. Nurse Williams was responsible for screening all potential candidates for weight loss surgery to determine whether they met the Tripler Bariatric Surgery Program eligibility criteria. (Williams: 1-44; Verschell: 10-194; Ex. 222 (Tripler Weight Loss Surgery Guidelines).) Nurse Williams testified that, generally the consult from the primary care physician would contain information addressing the two patient eligibility criteria, but that if she received a consult that did not have that information, she would obtain it herself. (Williams: 1-46, 1-49-51.)

58. Patients are first enrolled in the Tripler Bariatric Surgery Program during the Information Session. (Ex. 166 (Tripler Pre-Op Pathway).)

59. Tripler's "Multidisciplinary Pre-Op Weight Loss Pathway" indicates that, typically patients would meet one-on-one

with a bariatric surgeon within approximately one month of the Information Session. (Ex. 166.) Here, the only evidence that a surgeon was involved in screening Christina for acceptance into the Tripler Bariatric Surgery Program is a medical note entered by Dr. Schriver on March 30, 2010, the same date that Christina attended the Information Session. (Ex. 1008 at USA 000601-02.) Dr. Schriver did not testify at trial. Dr. Schriver's note did not document any previous diagnoses of obesity, or any prior weight loss efforts by Christina. (Id.) There is no other evidence that Christina met one-one-one with a surgeon prior to her presurgical meeting on September 14, 2010.

## V.  Christina's Course of Care at Tripler

### A. Christina's Personal and Medical History

60. Christina was born in Omaha, Nebraska on January 21, 1978. She was adopted at two weeks of age and raised primarily in Florida after her father retired from the military. (Christina: 5-8-9.)

61. Christina married Aaron Moseley in 1997, and the two had a son, N.M., who was born on February 10, 1998. Christina and Aaron divorced, and shared custody of N.M. thereafter. (Id. at 5-11-13, 5-21-22.)

62. Christina testified at trial that she considered herself to be relatively petite during her youth, and that she weighed 98 pounds when she got pregnant with her son at age 20.

31

(Id. at 5-108.) She further testified that she was able to lose most of her pregnancy weight and return to a normal body weight of approximately 110 to 115 pounds about a six months to a year after giving birth. (Id. at 5-109.)

63. A few years after giving birth, Christina trained as a truck driver and began driving semi trucks for a national trucking company. For approximately four years she worked this job, during which time her weight rose to 150 to 160 pounds. (Id. at 5-14-17.)

64. During the four years that Christina worked as a truck driver, N.M. lived with his father in Kentucky, and Christina tried whenever possible to get routed through Kentucky to see them. (Id. at 5-16-17.) In early 2007, Christina decided to end her career as a truck driver to spend more time with her son. She moved to Kentucky and obtained a job at the front desk of a Holiday Inn Express. Her son moved in with her. (Id. at 5-20-21.)

65. Christina arranged a transfer to the Holiday Inn near Dothan, Alabama, where her parents lived, and she and her son moved there sometime in 2007. (Id. at 5-22-24.)

66. Christina married Angelo Rivera in January of 2008. (Id. at 5-24-26; Rivera: 3-98.) At the time of her marriage, Christina recalls that she "had gotten bigger," or gained more weight. (Christina: 5-26.) Angelo joined the Army in January

32

2008, and after boot camp his first duty assignment was to Wheeler Air Base in Honolulu, Hawaii. (Rivera: 3-97, 3-101-103.) Christina and Angelo therefore moved to Honolulu in 2008. N.M. remained in Kentucky with his father. (Christina: 5-27-30.) At the time of the move to Hawaii in 2008, Christina states she weighed approximately 170 or 180 pounds. (Id. at 5-111-112.)

67. Prior to moving, Christina was required to undergo a screening to make sure she could travel to her husband's new duty station without limit. On June 12, 2008, therefore, Christina was examined by Dr. Xiaolu Wu at the Lyster Army Health Clinic at Fort Rucker, Alabama. (Ex. 350 at 000560.) At the time of this visit, Christina's documented weight was 190 pounds and her BMI was calculated to be 35.9. Dr. Wu's report stated that she was "currently very health" and that she could travel to Angelo's duty station without limit. (Id. at 000561.) The record of Christina's visit with Dr. Wu does not mention obesity as a diagnosis. (Id.)

68. Christina testified that her medical history prior to moving to Hawaii consisted of a hernia operation at age 4, a tonsillectomy during childhood, and a cesarean section for the birth of her son. (Christina: 5-29; Ex. 349.) She stated that her general health throughout her life had been good, and that she had never thought of herself as having a weight problem. (Christina: 5-29, 5-37-38.) Christina also testified that she had

33

never tried any sort of formal or informal diet before her entry into the Tripler Bariatric Surgery Program. (Id. at 5-38, 5-44.)

69. Angelo Rivera likewise testified that Christina's weight was never a concern for him. (Rivera: 3-103.) He stated that, to his knowledge, prior to entering Tripler's Bariatric Surgery Program, Christina had never tried any kind of weight loss "program" that you "had to pay for," nor had any of her medical providers tried to assist her with weight loss. (Id. at 3-109.) Angelo testified that he remembered that there were diet pills in their home at some point, and that they had tried Hydroxycut, but he could not recall whether that was before or after Christina joined the Tripler Bariatric Surgery Program. (Id. 3-126.) Angelo also testified that Christina had spoken to him about going to the gym a couple of times. (Id. at 3-148.) Angelo stated that he and Christina knew about weight loss surgery (although they had not heard the term "bariatric") before she learned about the Bariatric Surgery Program, and that they had researched weight loss surgery online when they lived in Alabama. (Id. at 3-107, 3-148-149, 3-154.) He also testified that, after he returned from deployment (in September 2009), Christina first mentioned weight loss surgery to him as "something that I think she -- she kind of knew about." (Id. at 3-103, 3-106-107.) Nevertheless, he stated that she only expressed concern about her weight to him after she had been

referred to the Bariatric Surgery Program. (<u>Id.</u> at 3-149.)

70. Beginning in June of 2008, Christina received her health care through the military health care system; thus, all of her outpatient medical records from June 2008 to the date of her surgery on September 27, 2010 were maintained within the military's electronic medical record system called "AHLTA." (Ex. 1008; Smiley: 1-143-145, 1-148, 2-11.) Christina's AHLTA records do contain some entries addressing Christina's weight history. In a May 20, 2010 note, Andrew Ching wrote that "Christina states her weight problems began at age 25," and that "Christina states that in the past she has attempted to use diet pills as a way to lose weight." (Ex. 1008 at 000620.) In a September 8, 2010 medical note, Xavier Pena wrote that Christina "reported a personal history of weight problems for the past 8 years," and that "[d]espite previous attempts at weight loss in the past 8 years, including exercise and Alli she began to consider having gastric bypass surgery." (Ex. 1008 at 000706.)

71. During the period from June 2008, when she moved to Hawaii, until March 19, 2010, Christina sought medical treatment approximately fourteen times for minor, routine health issues. Each of these visits generated an electronic medical record, none of which document any serious medical problems, and none of which mention a weight problem or obesity. (Ex. 350.)

**B. Christina's Referral to the Bariatric Surgery Program**

72. On March 19, 2010, Christina went to see Dr. Nancy Smiley at the Schofield Barracks Family Practice Service Clinic for a routine "well woman visit." (Ex. 1008 at USA 000598; Smiley: 1-146.) Dr. Smiley recorded Christina's weight on that date as 220 pounds, and her BMI was automatically calculated to be 41.57. (Ex. 1008 at 000598, Smiley: 1-151.) Dr. Smiley testified that Christina "had a normal exam except for morbid obesity." (Smiley: 1-151.)

73. Dr. Smiley testified that she discussed Christina's weight problem with her, and asked her what she had done in the past to try to lose weight. Dr. Smiley testified at trial that Christina told her that she had just started exercising, and that she "had tried many times in the past to lose weight with diet and exercise and wasn't successful." (Id. at 1-150-152.) During prior deposition testimony, however, Dr. Smiley did not mention this exchange about Christina's prior weight loss efforts. (Id. at 2-9.) The AHLTA record reflects Dr. Smiley's diagnosis of "obesity" and the fact that Christina stated that she had just started exercising, but does not contain any other information about Christina's weight history. (Ex. 1008 at 000598-600.) Dr. Smiley testified that she would normally put information about weight history in the "personal history" section of her note. (Smiley: 1-152.)

74. At the conclusion of the March 19, 2010

appointment, Dr. Smiley gave Christina a tip sheet on nutrition, and consults (or referrals) for a nutritional program and for the Tripler Bariatric Surgery Program. (Id. 1-153.) The referral to the Bariatric Surgery Program read "32 year old healthy nonsmoker, BMI 41, would like to be enrolled in Bariatric Program. Please evaluate and treat. Thanks, NS." (Ex. 1008 at 000602.)

75. Because of the referral entered into the AHLTA record, shortly after the appointment with Dr. Smiley, Christina received a call from the nurse-coordinator for Tripler's Bariatric Surgery Program, Yvette Williams, inviting Christina to an Information Session for the Tripler Bariatric Surgery Program. (Christina: 5-47-48; Williams: 1-55.)

**C. Christina's Enrollment and Participation in Tripler's Bariatric Surgery Program**

76. On March 30, 2010, Christina attended the Information Session at the Tripler Bariatric Surgery Program. Christina's weight was documented as 221.1. pounds on that date, and her BMI was recorded as 41.78. (Ex. 1008 at 000601.) The Information Session included a 90-minute group presentation on bariatric surgery led by Dr. John Schriver. (Id.)

77. Christina testified at trial that she had not made up her mind about having surgery after the Information Session. (Christina: 5-57.) Conversely, Angelo Rivera testified that Christina had essentially decided to have the surgery after

37

attending the Information Session, and that she knew she wanted Roux en Y gastric bypass surgery. (Rivera: 3-114-117.) He testified that she "had a positive attitude about" the surgery after the Information Session, and that she "felt like it was something that could work for her, that it would be successful in helping her lose the weight." (Id. at 3-114.)

78. As noted above, the Court has found that there were two primary criteria used at Tripler in 2010 to screen patients to determine their eligibility for the Tripler Bariatric Surgery Program: (1) the patient must have a BMI of 40 or above with no comorbidities, or 35 or above with at least one obesity-related comorbidity; and (2) the patient must have failed "all medical weight loss options and [feel] that any further non-surgical attempts would be futile." (Ex. J5.) Dr. Lim confirmed that these were the Tripler eligibility requirements, and that the second prong requires that the patient have tried "some weight loss program." (9/4/13 (Ex. 355) at 28-31, 38-39, 71.)

79. Patients were enrolled in the Tripler Bariatric Surgery Program during the Information Session. (Ex. 166 (Tripler Pre-Op Pathway).) As to the first prong of Tripler's eligibility test, Christina had no comorbidities and her BMI was above 40 at the time she attended the Information Session. (Ex. 1008 at 000601.) As to the second prong, there is no entry in Christina's AHLTA medical records regarding Christina's weight loss history

38

until well after the March 30, 2010 Information Session. Her
medical records up until March 30, 2010 do reflect a BMI that
fluctuated between 35.9 and 42.06; however, they do not contain
any mention of prior weight loss attempts. (See Ex. 1008.)
Indeed, Christina's weight loss history is first mentioned in the
AHLTA records in a medical note entered by Andrew Ching on May
20, 2010. (Ex. 1008 at 000620.)

    80. On April 13, 2010, Christina attended a 210-minute
group orientation session to begin the First Phase of the LEAN
Healthy Lifestyles Program, as a part of her participation in the
Tripler Bariatric Surgery Program. On that date, her height was
measured at 61.5 inches, her weight was 224 pounds, and her BMI
was automatically calculated as 41.64. (Ex. 1008 at 000606.) The
LEAN Healthy Lifestyles Program was a "behavior modification
program focusing on healthy lifestyles" that all Tripler
Bariatric Surgery Program patients were required to complete.
(Verschell: 10-117, 12-83-84.) Prior to surgery, patients were
required to lose at least 5% of their body weight through the
LEAN program. (Lim 9/4/13 (Ex. 355) at 34.) Dr. Verschell, the
head of the LEAN program, testified that overweight service
members who participated in the LEAN program via telehealth met
or exceeded the national rates of average weight loss of 8% to
10% per year. (Id. at 10-172-173.) Dr. Verschell also testified
that frequent and long-term contact with a behavior modification

program such as the LEAN Healthy Lifestyles Program can be a successful, nonsurgical method of preventing weight regain. (Id. at 10-182-183.)

81. On April 23, 2010, Christina attended a 30-minute behavioral therapy group session as part of the Second Phase of the LEAN Healthy Lifestyles Program. On that date, her height was measured at 61 inches, her weight was 221 pounds, and her BMI was automatically calculated as 41.76. (Ex. 1008 at 000614-615.) Christina attended another 30-minute behavioral therapy group session on May 19, 2010, at which time her weight was 217 pounds, and her BMI was calculated as 41. (Id. at 000618-619.)

82. On May 20, 2010, Christina attended a 90-minute individualized behavior therapy session in conjunction with participation in the LEAN Healthy Lifestyles Program. (Id. at 000621.) This was a one-on-one session with Andrew Ching, a psychology technician. (Id.) Mr. Ching testified that he was not involved in screening patients for surgery eligibility. (Ching: 2-75.) He testified that he may have asked Christina at some point whether she was sure she wanted to continue with surgery, but that he did not make recommendations regarding surgery. (Id. at 2-85.) Mr. Ching also testified that Dr. Verschell, his supervisor, would typically briefly check in on the patient at some point during the one-on-one sessions. (Id. at 2-78.)

83. On May 20, 2010, Christina weighed 219 pounds and

her BMI was automatically calculated as 41.05. (Ex. 1008 at 000620.) During the 90-minute session, Mr. Ching took a medical history from Christina. In the medical note from the session, Mr. Ching writes that "Christina states that her weight problems began at age 25 . . . Christina states that in the past she has attempted to use diet pills as a way to lose weight." (<u>Id.</u>) Mr. Ching testified that Christina was an enthusiastic participant in the LEAN Healthy Lifestyles Program, and that she was successful at losing weight through the program. (<u>Id.</u> 2-84.)

84. On June 21, 2010, Christina attended a 60-minute behavioral assessment/therapy session with Andrew Ching. (Ex. 1008 at 000641.) As of that date, Christina weighed 213 pounds, and her BMI was calculated to be 40.25. (<u>Id.</u>) The medical note from this session indicates that Christina expressed an interest in trying the prescription weight-loss medication orlistat (the lower-dose, over-the-counter version is called Alli). (<u>Id.</u>; <u>see also</u> Verschell: 12-100-101.) Dr. Verschell prescribed orlistat for Christina, and she appears to have taken it from around June 30, 2010 to sometime between July 7, 2010 and July 13, 2010. (<u>See</u> Ex. 1008 at 000645-000653.) On July 7, 2010, Christina weighed 212 pounds and her BMI was calculated at 40.13. (<u>Id.</u> at 000647.)

85. As noted above, Dr. Verschell was Andrew Ching's supervisor, and checked in on Christina during her sessions with Mr. Ching. Dr. Verschell testified at trial that Christina lost

weight and learned and practiced behaviors in the LEAN Healthy
Lifestyles Program that would allow her to keep off the weight.
(Verschell: 12-86.) Dr. Verschell further testified that he
recalled that "on at least two occasions" he discussed with
Christina her successful participation in the LEAN Healthy
Lifestyles Program and "talked with her about whether she wanted
to proceed with surgery." (Id. at 10-153-154.) Dr. Verschell
further testified that Christina told him that she believed
surgery "was in her best interest," and "that it would be
difficult to keep the weight off without the surgery." (Id. at
10-154.) Dr. Verschell testified that it was not his job or
practice to make a recommendation one way or another to patients
regarding bariatric surgery. (Id. at 12-93-94.) He also stated
that, if a patient wanted surgery and was ready to have surgery,
he would want them to have the surgery. (Id. at 12-91-92.) Dr.
Verschell stated that he never raised the issue of whether
Christina's success in the LEAN program suggested that she may
not need to proceed with surgery at a multidisciplinary team
meeting, or with Christina's surgeon.[2/] (Id. 12-87-88.)

    86. On June 21, 2010, Dr. Verschell sent an electronic

---

    [2/] The Court notes that some of the entries made in
Christina's electronic medical records were described by Dr.
Verchell as "templates" that were "copied forward." Thus, some
entries are not specific to the patient. (Verschell: 10-146-147,
12-93, 12-104-107.) Christina's medical records appear to contain
several instances of such templates. (See Ex. 1008 at 000652,
000693, 000698, 000714, 000721.)

note to Captain Benjamin Wunderlich, a Registered Dietician who worked with Christina in the Tripler Bariatric Surgery Program, which read: "Bariatric patient ready for individualized dietary counseling. She's doing very well – maybe you can review the need for surgery?" (Ex. 1008 at 000648; Verschell: 12-116.) As of that date, Christina weighed 213 pounds, and her BMI was calculated to be 40.25. (Ex. 1008 at 000641.) Dr. Verschell testified that he did not follow up with Captain Wunderlich after sending the note. (Verschell: 12-116-117.)

87. Christina continued to meet with Andrew Ching often during the month of July. On July 14, 2010, Christina weighed 208 pounds and her BMI was automatically calculated as 38.04. (Ex. 1008 at 000652.) As of that date, Christina reported to Andrew Ching that she was on a 1-cup diet of approximately 700 calories per day. (Id. at 000653.) On July 19, 2010, Christina weighed 207 pounds, and her BMI was calculated as 38.48. (Id. at 000657.) On July 21, 2010, Christina weighed 206 pounds and had a BMI of 38.92. (Id. at 000659.) On July 28, 2010, Christina weighed 203 pounds and had a BMI of 38.26. (Id. at 000672.)

88. Captain Wunderlich also met with Christina periodically throughout her time in the Tripler Bariatric Surgery Program. He first met with Christina on May 26, 2010. (Wunderlich: 3-48.) Captain Wunderlich testified that, at that time, Christina had already been accepted into the Tripler

43

Bariatric Surgery Program, and that he was not involved in screening patients for eligibility. (Id. at 3-16-17, 3-31.) Captain Wunderlich also testified that he never recommended that Christina postpone surgery in light of her success losing weight through the LEAN Healthy Lifestyles Program. (Id. at 3-32.)

89. During an August 16, 2010 appointment with Captain Wunderlich, Christina voiced a concern about "slowing down her weight loss so she does not turn into a skeleton." (Ex. 1008 at 000691.) On that date, Christina weighed 199 pounds and her BMI was calculated as 37.6. (Id.) Captain Wunderlich testified that Christina was losing weight because she was under-consuming calories; however, he did not document this concern in her medical record. (Wunderlich: 3-34-36.) During a September 3, 2010 appointment with Captain Wunderlich, Christina apparently again voiced a concern "about losing too much weight and being unable to stop weight loss so she does not become skeletal thin." (Ex. 1008 at 000699-700). As of that date, Christina weighed 189 pounds and her BMI was calculated as 35.86. (Id. at 000699.)

90. As a part of his work with Christina to prepare her for surgery and for her post-surgical dietary restrictions, Captain Wunderlich put Christina on a liquid diet for some period prior to surgery. (Wunderlich: 3-24-25.) Captain Wunderlich testified that his general practice was to have patients start with a two-day clear liquid diet, and then do seven days of a

full liquid diet, and then five days of a pureed diet. After this period of time, patients would return to their one-cup diet to work on portion control. Finally, about a week before surgery, patients would again start a full liquid diet of no more than 1200 calories per day to help reduce the liver size in preparation for surgery. (<u>Id.</u> at 3-25.) Based on the AHLTA records, it appears Christina completed her trial liquid diet over the period of time between August 18, 2010 and September 3, 2010. (Ex. 1008 at 000693, 000700.) She was apparently again placed on the liquid diet the week before her surgery on September 27, 2010. (Wunderlich: 3-25.)

91. As a part of the Tripler Bariatric Program's requirements for surgery, Captain Xavier Pena, a post-doctoral psychology intern at Tripler in 2010, was tasked with performing an independent psychological evaluation to determine whether there were any serious psychological issues that would prevent Christina from being an appropriate candidate for bariatric surgery. (Pena: 10-65-66.) Dr. Pena testified that he was not involved in screening patients for eligibility for surgery, and that he believed patients would be evaluated by a surgeon for eligibility prior to having their independent psychological evaluation. (<u>Id.</u> at 10-89-90.)

92. On September 8, 2010, Christina met with Dr. Pena. On that date, her weight was 196 pounds and her BMI was

calculated as 37.03. (Ex. 1008 at 000706.) The medical note Dr. Pena wrote states that Christina "reported a personal history of weight problems for the past 8 years," and that "[d]espite previous attempts at weight loss in the past 8 years including exercise and Alli she began to consider having the gastric bypass surgery approx 9 months ago . . .." (Id.) It also states that Christina identified "her health, ability to do those things she used to be able to do, and her son as her primary motivators for having the gastric bypass surgery." (Id.) With respect to the timing of Christina's use of Alli, Dr. Pena's note is unclear; however, as noted above, Dr. Verschell testified that he had prescribed orlistat (a higher-dose, prescription version of Alli) to Christina in June 2010 during her participation in the LEAN program. (Ex. 1008 at 000641; Verschell: 12-100-101.)

93. Dr. Pena met with Christina for a follow-up appointment on September 15, 2010. The September 8, 2010 note was "copied forward" into the September 15, 2010 note, which additionally stated that Christina demonstrated that she was knowledgeable about the surgery and had an understanding of the risks and benefits involved. (Ex. 1008 at 000717-718; Pena: 10-102-103.) Dr. Pena testified at trial that this assessment was based essentially on his asking the patient whether they understood the risks and benefits, and that if they answered "yes," that would be sufficient for his limited purpose. (Pena:

46

10-107-108.) Dr. Pena also testified that patients who had progressed through the Tripler Bariatric Surgery Program were likely to be "psychologically committed to surgery." (Id. at 10-112.)

94. The evidence adduced at trial demonstrated that Christina had a consistent pattern of weight loss while particpating in the LEAN Healthy Lifestyles Program. (Ex. 117.) Despite some testimony, as noted above, that Christina was on a liquid diet for some amount of time in preparation for surgery, her preoperative weight loss appears to have been relatively steady. (Wunderlich: 3-24-25; Ex. 117.)

95. Numerous witnesses testified that Christina was very successful losing weight through participation in the LEAN Healthy Lifestyles Program. (Williams: 1-91-92; Ching: 2-84; Verschell: 12-87; Wunderlich: 3-32-33.)

96. The Court finds that through her participation in the LEAN Healthy Lifestyles Program from approximately April 13, 2010 until the date of her surgery on September 27, 2010, Christina lost approximately 34 pounds, and her BMI decreased from above 41 to around 36.

**D.    The Preoperative Meeting with Dr. Payne**

97. On September 14, 2010, Christina met with her bariatric surgeon, Dr. John Payne, for her preoperative appointment. (Ex. 1008 at 000709.) On that date, Christina

47

weighed 193.9 pounds. (Id.) Her BMI was calculated to be 34.35; however, this was based on the mistaken entry of her height as 63 inches tall. (Id.) Taking into account Christina's actual documented height of 61 inches, her BMI on that date was approximately 36.6.

98. Dr. Payne testified that the preoperative meeting was not for the purpose of approving Christina for surgery because "[t]hat had already been pretty well determined." (Payne: 2-140-141.) Rather, Dr. Payne stated, his "job was to talk with her about which procedure [she wanted] and to explain to her what she had to look forward to in terms of risks and complications . . .." (Id. at 2-141.) Dr. Payne also testified that it "seemed unnecessary" to discuss with Christina whether she should postpone surgery in light of her weight loss, because she had already decided that surgery was what she wanted. (Id.) Dr, Payne stated that he was "not sure" whether he considered Christina's BMI at all on the date of the preoperative meeting because Tripler's policy was that the BMI taken on the date of the Information Session was "the one of record." (Id. at 2-143.) Indeed, Dr. Payne stated that it was "irrelevant" to the question of eligibility for surgery if the patient's BMI fell during the time she was in the Bariatric Surgery Program (but before surgery). (Id. at 2-117-118.) Dr. Payne also testified that he never gave Christina a recommendation for or against surgery.

(Id. at 2-114.)

99. Dr. Payne testified that he spent over twenty minutes discussing the diagnosis, treatments, alternatives, and potential side effects, as well as the possible risks of Roux en Y gastric bypass surgery. (Id. at 2-141; see also Ex. 1008 at 000710.) He also testified that he told Christina that she would probably regain the weight she had lost if she did not have surgery, regardless of whether she stayed in the LEAN Healthy Lifestyles Program. (Payne: 2-191.) Dr. Payne also acknowledged that this message regarding potential weight regain without surgery was also included on the computer-generated informed consent form. (Id. at 2-190-191.)

100. With respect to complications, Dr. Payne testified that his complication rate was quite low, in the range of 1% to 3%, and that he always informed his patients of that rate. (Id. at 2-109-113.) The Court heard testimony from Dr. Lim; however, that the actual range of serious complications is closer to around 20%. (Lim 9/4/13 (Ex. 355) at 64-65.) As noted above, the medical literature appears to echo this higher complication rate. (Ex. 1031 (2008 SAGES Guidelines) at 13/31; Ex. 273 (2013 Jones Article) at 008443.) Dr. Payne testified that informing patients regarding complication rates involved a balance between "letting them know about that and terrifying them." (Payne: 2-162.)

101. Christina testified as to her recollection of the

49

preoperative visit, stating that it "really wasn't that in depth," and that Dr. Payne confirmed which surgery she was going to have and then went "over the dates that are available and kind of the recovery time kind of thing." (Christina: 5-70.) Angelo Rivera, who also attended the preoperative meeting with Dr. Payne, testified that Dr. Payne "explained the risks and benefits of going forward or not going forward." (Rivera: 3-131.)

102. On September 24, 2010, Christina had her pre-anesthetic evaluation at Tripler. On that date, she weighed 189 pounds. (Ex. J1 at 001152.)

**E. The Day of Surgery**

103. On the day of surgery, September 27, 2010, Dr. Plackett, a general surgery resident and administrative chief resident at Tripler, was asked to go over the informed consent form with Christina and obtain her consent for the procedure. (Plackett: 10-7-8.)

104. Tripler apparently had a policy that informed consent must be obtained within thirty days of a planned surgical procedure; however, there was also testimony that the informed consent process began at the Information Session and was an ongoing process throughout the program. (Williams: 1-99-100; Plackett: 10-45; Leitman: 4-114-115; Jones: 7-176-178.)

105. Apparently as a part of this ongoing process, the Tripler staff, including Dr. Payne, advised Christina that she

would regain the weight she lost through the LEAN Healthy
Lifestyles Program if she did not have bariatric surgery.
(Christina: 5-67-68; Payne: 2-191.) Penny Ball, a patient in the
Tripler Bariatric Surgery Program in 2009 and 2010, stated that
Tripler staff "forewarned" patients during their orientation to
the program that the nutritionists "would probably discourage us
on the surgery" because "that's their job to do that," but that,
even if they lost some weight in the program, the patients would
probably gain the weight back unless they had surgery. (Ball (Ex.
353) at 37-38, 47-48.) There was, however, contrary testimony
regarding the information provided with respect to weight regain
from several Tripler providers. Dr. Verschell testified that he
would never tell a patient that she would likely regain all the
weight she had lost through the LEAN program without surgery.
(Verschell: 12-88-89.) Dr. Verschell stated that he would
"wouldn't have said that she would have probably lost all her
weight because that, generally speaking, doesn't happen," but
that he would also never tell Christina that she would regain all
the lost weight without surgery "[b]ecause it's not a foregone
conclusion." (Id.) Andrew Ching and Nurse Williams echoed this
testimony, stating that they too never told patients that they
would regain any lost weight if they did not have surgery.
(Ching: 2-85; Williams: 1-102-103.)

106. One of the risks of bariatric surgery is that the

patient will eventually regain weight lost following surgery. (See Ex. 273.) Nevertheless, the Court finds it troubling that some staff members of the Tripler Bariatric Surgery Program promoted the LEAN Healthy Lifestyles Program as an effective program to achieve sustained weight loss, while at the same time other staff members counseled Christina that any weight she lost through the LEAN program would not be sustainable without surgery. The Court is also troubled by the fact that, while Christina was informed of the risks of having weight loss surgery, she was also told that the risks of not having surgery (weight regain and eventual development of comorbidities) may be even greater, even though she had already successfully lost approximately 34 pounds in the LEAN Healthy Lifestyles Program.

107. Dr. Plackett testified that he did not recall specifically meeting with Christina on September 27, 2010, but assumed he had done so because of his signature on the informed consent form. (Ex. 1004; Plackett: 10-11.) Because he did not recall meeting with Christina specifically, Dr. Plackett's testimony was based on his normal practice. (Plackett: 10-11-12.) Dr. Plackett explained that he was typically called in to do the informed consent as the administrative chief resident if all of the paperwork had not been completed during the preoperative meeting. (Id. at 10-9-10.) He also testified that, if there were no questions from the patient, it typically took him about five

minutes to provide the information necessary for a patient to give informed consent. (Id. at 10-29.)

108. The informed consent form, which Christina signed, includes a brief description of the operation, a list of the risks of the procedure and the common complications, and statements regarding the likely outcome and the necessary post-operative follow-up care. (Ex. 1004 at 000475.) It states that the alternatives to the operation are medical diets or other bariatric surgical procedures. (Id.) The form states that the "risks and benefits" associated with those alternatives are that "[m]edical weight loss has few risks, although sustained weight loss is usually not attained." (Id.) The risks associated with forgoing any treatment are stated as "[l]ack of weight loss and medical illness associated with obesity." (Id.)

109. Dr. Plackett testified that he would typically go through the form line by line with the patient and explain each element, including providing an explanation of how the surgery is performed, the risks associated with the surgery (e.g., bleeding, leakage, strictures, nutritional deficiencies), and the alternatives and the risks associated with those alternatives (including a statement that, often, weight lost through diet and exercise is regained). (Plackett: 10-12-14.) Dr. Plackett testified that it was not his standard practice to discuss the patient's BMI on the date of surgery, or to provide patients with

53

specific percentages associated with complication risks. (Id. at 10-47, 10-56.) He also testified that he would not have discussed with Christina whether she should have attempted other weight loss approaches before trying surgery because it was his understanding that that conversation would have occurred when the patient first entered the Bariatric Surgery Program. (Id. at 10-51.) Dr. Plackett testified that he gave patients an opportunity to ask any questions they may have, and that surgery would be canceled if a patient expressed "significant reservations" or did not indicate a full understanding of the consent form. (Id. at 10-17-18.)

110. Christina testified that she did not recall signing the consent form or having it explained to her. (Christina: 5-147-148.) She also testified that she did not recall having a conversation with Dr. Plackett prior to surgery, and only recalled meeting him after her surgery. (Id.) Nevertheless, Christina testified that she did recall signing some papers on the date of surgery, and that the signature on the informed consent form was, indeed, hers. (Id. at 5-47, 5-152-154.) She also testified that she signed the informed consent form only after she was in a hospital gown and hooked up to an IV. (Id. at 5-154.) This testimony is contradicted by testimony by Angelo Rivera that the consent forms were signed prior to Christina being prepped for surgery, and the testimony of Dr.

Plackett that consent forms were signed while patients were still in street clothes and that a patient would never have been permitted to move forward with surgery if she had been on any sort of medication at the time she signed the informed consent forms. (Rivera: 3-157; Plackett: 10-19.) The Court found Christina's credibility somewhat questionable, as she was often unable to recall numerous important details; although, the Court recognizes that Christina has suffered severe post-surgical complications.

111. Both Christina and Angelo Rivera testified that Christina was nervous before surgery and unsure whether she should go through with it. (Christina: 5-73-74; Rivera: 3-156-157.) Angelo testified that Christina expressed her anxiety about the operation after she had signed the consent form. (Rivera: 3-157.)

112. On the date of surgery, Christina weighed 189.5 pounds and her BMI was automatically calculated (based on a mistaken height of 63 inches) to be 34.3. (Ex. J1 at 001197.) Using her actual height (as discussed above), her BMI on that date was approximately 36. Thus, since entering the Tripler Bariatric Surgery Program on March 30, 2010, Christina had lost approximately 34 pounds through the LEAN Healthy Lifestyles Program. The evidence adduced at trial suggests that a person with a normal, healthy weight would have a BMI of 18.5 to 24.9.

(Jones: 4-147, 8-62; Ex. J5 at 0011571.) Thus, a patient who is 61 inches tall would have a normal, healthy weight if she weighed between 101 pounds and 132 pounds. (Jones: 7-166; 8-62-63, 8-66.) Christina's documented weight on the date she attended the Information Session was 221 pounds, indicating that Christina had at least 89 pounds of excess weight at that time. Thus, Christina's loss of 34 pounds in the LEAN program represented a loss of approximately 15% of her body weight and 38% of her excess body weight.

113. The Court finds that, as a part of the informed consent process, none of Christina's providers discussed with her the fact that her BMI had fallen below 40 with no comorbidities, and that this indicated, according to the prevailing standards of conduct in the applicable medical community, that the risks of the surgery outweighed the potential benefits for her.

## VI. Christina's Post-Surgery Complications

114. On September 27, 2010, Christina Mettias underwent the Roux en Y bariatric surgery at Tripler Army Medical Center. (Ex. 1 at 001148-001151.) As a direct result of complications of the surgery, Christina reasonably and necessarily required the medical treatments detailed below. Because Christina was at the time still a military dependent, all of the following medical treatments were covered by Tricare. (Tr. 12:-122-123.)

115. Christina's post-operative course was complicated

by tachycardia and anemia for which she received a transfusion of two units of packed red blood cells. (Id. at 001145.)

116. On October 1, 2010, Christina was discharged and prescribed liquid narcotics for pain. (Id. at 001173-001175.)

117. On October 9, 2010, Christina was re-admitted to Tripler Army Medical Center after she appeared in the Emergency Room, reporting sharp and non-radiating pain in her left lower chest and left upper abdominal area. (Ex. 2 at 001530-0011542.) It appeared that she had a hematoma, or bleed. As a result, on October 11, 2010, Christina underwent laparoscopic surgery, during which surgeons lysed adhesions, and evacuated "some dark blackish thick fluid" and a "large pocket of what seemed to be a liquefied hematoma." (Id. at 001543-001544.) On October 15, 2010, Christina was discharged. (Id. at 001539.)

118. On October 26, 2010, Christina was re-admitted to Tripler after she again came to the Emergency Room, reporting persistent left shoulder pain that radiated down her left lateral chest to her left lower back, despite being on prescription narcotic pain medication. (Ex. 3 at 001910-001912.) A CT scan showed fluid collection near the gastric remnant, with re-accumulation of the intra-abdominal fluid collection in the same location of her previous hematoma. On October 27, 2010, a limited Scout CAT scan was performed and a "pig tail" catheter drain was placed in the area of the fluid collection. Christina

57

was discharged on November 2, 2010 with the fluid drain still in place. (Id. at 001921-001925.)

119. In December of 2010, Christina met with Dr. Payne, got the drain removed, and traveled back east to Alabama to spend Christmas with her family. (Christina: 5-82-83.) On December 20, 2010, Christina went to the Emergency Room of the Southeast Alabama Medical Center, reporting "7 out of 10" abdominal pain. A CT scan revealed a post-operative seroma, or fluid build-up. (Ex. 76 at 004506; 004513.) On the advice of the Alabama doctors, Christina return to Hawaii for treatment. (Christina: 5-85-86.)

120. On January 3, 2011, Christina was re-admitted to Tripler. A CAT scan of her abdomen showed re-accumulation of the intra-abdominal hematoma near the gastric remnant and a right adnexal mass. (Ex. 4 at 0002433-002437.) Thus, on January 6, 2011, Christina was taken back to surgery and underwent a diagnostic laparoscopy, lysis of adhesions, partial gastrectomy, esophageal dilation, repair or the gastrojejunostomy and placement of a gastric feeding tube. During the operations, surgeons perforated Christina's gastric pouch and diaphragm. (Id. at 002440-002447.)

121. On January 8, 2011, Christina went into hypercapnic respiratory failure, requiring intubation, and breathing via a ventilator. (Id. at 0002440.) On January 10, 2011, Christina was still in critical condition, with persistent

tachycardia, hypertension, and leukocytosis and infection from the multiple bowel perforations. An x-ray revealed that her feeding tube might have become dislodged. For this reason she was taken back to surgery for a diagnostic laparoscopy, washout and "NG" tube verification. Surgery revealed a probable persistent leak near the revised gastric pouch with poor surrounding tissues for repair. (Id. at 002440; 002450-002451.)

122. On February 22, 2011, Christina was taken to Pali Momi Medical Center, where a stent was surgically placed in her esophagus. The surgeons also removed a JP drain placed in a prior surgery that had eroded into the esophagus. (Id. at 002440.)

123. On February 23, 2011, despite receiving "several boluses of narcotics," Christina reported significant pain. Physicians at Tripler switched her from Fentanyl to Dilaudid to address the pain. Beginning March 4, 2011, narcotic medications, including Roxycodone, Tylenol, and Dilaudid, were ordered to control Christina's pain. On March 10, 2011, after a Pain Management Service consult, Christina's pain medication was changed to Oxycontin for long-acting pain control, Roxicet for breakthrough pain, and Gabapentin. (Id. 4 at 002440-002441.)

124. On March 15, 2011, Christina was discharged. Her medications included Promethazine (Phenergan) for nausea, Oxycodone (Roxicet) and Oxycontin for pain. She was discharged with a gastric tube and a JP drain in place. (Id. at 002442.)

125. On March 27, 2011, Christina was re-admitted to Tripler from the Emergency Room for complaints of inability to swallow foods and liquids, vomiting, and abdominal and epigastic pain. (Ex. 5 at 007372-007375.) She was given IV medications to control nausea and abdominal pain. A CT scan was performed on March 28, 2011 to evaluate the esophageal stent placement, and on April 1, 2011 Christina was discharged. Her pain medications included Oxycodone and Tylenol. (Id. at 007381-007386.)

126. On April 12, 2011, Christina went to the Emergency Room at Tripler, reporting retching and abdominal, epigastric, and back pain. Christina was admitted for close monitoring, pain management, and nutritional management. (Ex. 6 at 007721, 007724.) She was given IV pain medication and was fed through a G-tube. During her hospital course she was brought to Pali Momi Medical Center for an esophagogastroduodenoscopy ("EGD"). Her G-tube feedings were discontinued on April 30, 2011, and she was discharged on May 5, 2011, with prescriptions for Roxicodone elixir, Oxycodone and Gabapentin, and Dilaudid (for breakthrough pain). (Id. at 007726; 007728-007729; Ex. 51.)

127. On May 16, 2011, Christina was re-admitted to Tripler for bilateral lower abdominal pain, described as a "burning" sensation, with a two-day history of bloody stools, diarrhea, chronic pain, nausea, vomiting, and an intolerance to food and fluids. The diagnostic assessment was that of a "33 year

old female with complicated surgical history, chronic caloric insufficiency, chronic narcotic dependence, worsening of chronic abdominal pain, diarrhea, melena [(bloody stool)]." (Ex. 7 at 008960-008964.) Laboratory analysis of stool samples revealed a bacterial infection. Christina was treated with antibiotics and discharged on May 26, 2011. (Id. at 008970-008974.)

128. On May 31, 2011, Christina was re-admitted to Tripler due to burning epigastric pain, nausea, vomiting, fatigue, and inability to take foods or fluids by mouth. A CT scan revealed a ventral hernia in the left lower quadrant, and a knuckle of her small bowel was found to be incompletely protruding into this hernia. An EGD was performed for narrowing in her esophagus and her ongoing epigastric pain. A balloon dilation was performed, and biopsies were taken. An esophageal stricture was noted. Christina was discharged on June 5, 2011. (Ex. 8 at 009434-009437, 009444-009454; Ex. 52.)

129. On July 7, 2011, Christina was readmitted to Tripler after she went to the Emergency Department reporting persistent mid-epigastric abdominal pain, similar to her chronic pain, but which had worsened over the previous week. Christina described the pain as intermittent "stabbing," worsened by movement. She underwent an EGD and was treated with IV fluids for dehydration. The diagnostic assessment advised to "consider pain management consult in am," and "consult GI for repeat EGD to

evaluate for re-stenosis." Christina was discharged on July 11. (Ex. 9 at 009712; 009715; 009737-009741, 00943-009744; Ex. 53.)

130. On August 4, 2011, Christine was again re-admitted to Tripler after she reported an inability to swallow food and medication, feeling that foods and medication were sticking in her throat (dysphagia). Christina reported massive left sided chest pain and right upper quadrant pain, and that all of her pain might be exacerbated by her inability to swallow her pain medication. (Ex. 10 at 010040.) On August 5, 2011 Christina underwent an EGD with balloon dilatation and steroid injection at her esophageal stricture. Her pain was controlled with intravenous pain medication (Dilaudid). Her dysphagia gradually improved but she continued to regurgitate food with meals. On August 10, 2011, she underwent a second EGD. She experienced small amounts of regurgitation after meals. She was discharged on August 12, 2011. (Id. at 010052-010056; Ex. 54.)

131. On August 29, 2011 and October 17, 2011, Christina underwent additional EGDs at Tripler. (Ex. 56; Ex. 57.)

132. On October 17, 2011, Christina underwent a celiac plexus block at the Honolulu Spine Center to address her chronic abdominal pain. (Ex. 58 at 006922-006923.)

133. On November 10, 2011, Christina underwent a bilateral T11 and T12 intercostal nerve blocks, or injections of medicine to her nerves to address the pain in her chest and

abdomen, at the Honolulu Spine Center. (<u>Id.</u> at 006913-006919.)

134. On November 18, 2011, Christina underwent an EGD and balloon dilation at Tripler. (Ex. 59.) On December 13, 2011, Christina underwent another EGD with placement of a stent at Tripler. (Ex. 60; Ex. 11 at 010459-010460.) On the same day, Christina was re-admitted to Tripler for observation and pain management. Christina reported that the injections and nerve blocks at the Honolulu Spine Center did not control her pain. She reported taking Roxicet and wearing Fentanyl patches for pain. During her hospitalization, Christina had frequent vomiting and was not given her IV Zofran and Phenergan as needed. She was noted to be in a great deal of pain. On December 18, 2011, consults (or referrals) were placed to the Psychiatry Service and Pain Management to assist with Christina's "chronic pain and visceral hypersensitivity given her multiple prior surgeries [and] complications." Upon discharge, the pain anesthesia provider prescribed Dilaudid pills to wean her off IV dilaudid pushes, Tylenol elixir, Roxanol Elixier, Fentanyl Patches, and Effexor. Christina was discharged December 23, 2011. (Ex. 11 at 010451-010457; 010459.)

135. On January 3, 2012, Dr. Nancy Smiley had a telephone conversation with Christina, during which she documented "chronic pain" as part of Christina's medical history. (Ex. 47 at 001031.) Dr. Smiley understood that the chronic pain

had been occurring since the gastric bypass surgery of September 27, 2010. (Smiley: 2-21.) Christina had an in-person appointment with Dr. Smiley the next day to follow up with pain management. Christina reported being unable to eat due to food getting stuck in her throat. She admitted to feeling depressed, not sleeping well, and having a lot of pain. (Ex. 48 at 001034.) Dr. Smiley prescribed Zoloft for depression, anxiety, and chronic pain, and Pamelor for chronic pain. (Smiley: 2-25.) In the time that she treated her, Dr. Smiley did not find Christina to be drug-seeking, and Christina did not appear to desire to stay in the hospital longer than necessary. (Id. at 2-26.)

136. On January 18, 2012, Christina underwent an EGD at Tripler. (Ex. 62.) On January 24, 2012, she underwent anther EGD with removal of esophageal stent at Pali Momi Medical Center. During the procedure "severe stenosis" was identified, and the scope could not traverse that area until after a balloon dilation. The stent was found to have migrated and was now embedded in the gastric pouch. (Ex. 63.)

137. Christina left Hawaii and moved to Dothan, Alabama in or around February 2012. On February 24, 2012, Christina underwent an EGD at the Dothan Surgery Clinic. (Ex. 64.) On March 23, 2012, she underwent another EGD at the Southeast Alabama Medical Center in Dothan. (Ex. 65.) On April 19, 2012, Christina underwent another EGD at the Dothan Surgery Clinic. (Ex. 66.)

138. On May 1, 2012, Christina was admitted to the Southeast Alabama Medical Center for a cholecystectomy and lysis of adhesions. She was noted to have "a significant amount of pain initially post-operatively in addition to nausea and vomiting." After improvement, she was discharged on May 3, 2012. (Ex. 67 at 004131-004132; Ex. 68 at 004126-004127.)

140. On May 10, 2012, Dr. George Smallfield of the University of Alabama Hospital at Birmingham proposed a dilation with Savory dilators, as opposed to the balloon dilations and stenting that Christina had received in the past. Dr. Smallfield noted that if dilation with Savory dilators was unsuccessful, surgery may be required. (Ex. 69.) On May 16, 2012, Christina underwent an EGD with Dr. Smallfield, and on May 23, 2012, Christina underwent a repeat EGD, again with Dr. Smallfield. (Exs. 70, 71.)

141. Thereafter, Christina underwent numerous subsequent EGDs in Dothan. (Exs. 72, 73, 74, 75, 77, 81, 84, 86.)

142. On February 6, 2013, Christina was admitted to Flowers Hospital in Dothan for evaluation of a fibroid (a noncancerous growth), as well as abdominal and pelvic pain. Under general anesthesia, Christina underwent a diagnostic laparoscopy, lysis of adhesions, a laparoscopic hysterectomy, and removal of a right round ligament fibroid. The surgeon noted "severe abdominal and pelvic adhesions." (Ex. 79 at 006238; Ex. 80.) Adhesions, or

scar tissue formations between organs, can cause blockages within organs, and when they block the gastrointestinal tract, the patient cannot eat and vomits. (Leitman: 4-62-63.) Adhesions can also cause pain. (Id. at 4-62.)

143. On May 6, 2013, Christina was again admitted to Flowers Hospital and underwent another surgery for lysis of adhesions (or, surgery to address scar tissue forming between organs). (Ex. 82.) On June 18, 2013, she was admitted to Southeast Alabama Medical Center and underwent surgery to repair an incisional hernia. She was discharged after two days. (Ex. 83.)

144. On January 22, 2014, Christina was treated for severe epigastric pain at the Digestive Health Specialists of Dothan, Alabama. (Ex. 85.)

145. As is made clear by the foregoing, Christina has had a great number of procedures which have created scar tissue, or adhesions, which have caused pain, and for which she has been prescribed painkillers. Christina will always have some adhesions and her pain is not likely to go away. (Leitman: 4-62-63.)

146. On September 25 and October 29, 2014, Christina underwent a multidisciplinary evaluation at the Doleys Clinic. (Ex. 87.) On October 8, 2014, Christina also underwent a pain management evaluation at the Doleys Clinic. The resulting recommendations included pool therapy, Butrans patches, and Norco

for breakthrough pain. (Ex. 88 at 007501.) Dr. Doleys noted that Christina continues to be a candidate for a potential intrathecal pump depending on how she responds to other therapies "as there does appear to be some opioid responsiveness to her pain." Christina's treatment is ongoing. (Ex. 89 at 007499.)

147. Christina Mettias' quality of life has been substantially worsened by the complications she has endured as a result of the Roux en Y surgery of September 27, 2010. Due to the complications resulting from the surgery, Christina has experienced chronic pain, which will likely last at least to some extent for the remainder of her life. (Leitman: 4-64.) Moreover, her pain is difficult to control with oral medications because her digestive tract has been shortened, and medications are malabsorbed. (Smith: 6-51-52.)

148. The gastric bypass surgery of September 27, 2010 has caused Christina to develop a chronic eating problem, namely, intolerance to oral foods and dysphagia (the sense of having food stuck in the throat). (Smith: 6-50, 6-65; Leitman: 4-59.) She has also developed dumping syndrom, which causes on-going bladder and bowel accidents. (Smith: 6-50-51, 6-65, 6-90-91; Leitman: 4-67-68.) Unfortunately, there is no cure for Christina's chronic pain, chronic eating problems, chronic malabsorption, fatigue and lack of endurance. (Smith: 6-73.)

149. In sum, the Court finds that as a proximate and

legal result of the Roux en Y gastric bypass surgery, Christina suffered numerous serious injuries and complications, including a perforated esophagus, perforated diaphragm, chronic esophageal fistula, gastric bleeding with chronic hematoma, left pleural effusion, and persistent nutritional deficiencies. These injuries have left her partially and permanently disabled, disfigured, in constant pain, chronically fatigued, unable to maintain her close relationship with her son, N.M., and other loved ones, in need of medical, rehabilitative and life care, and at risk for future complications.

150. The injuries and complications Christina suffered as a consequence of the Roux en Y gastric bypass surgery also caused some disruption and injury to her relationship with her son, N.M. Christina testified that N.M. was visiting over the summer during the time she was in the hospital because of complications from her surgery. (Christina: 5-103-104.) She further testified that their relationship has been affected because she can't take care of him any longer, and he now has to take care of her sometimes, helping her when she's sick and getting her her medicine. (<u>Id.</u> at 5-104.)

151. Christina life expectancy, based upon the National Vital Statistics Report, is 82 years of age. (Smith: 6-77-78.) Ms. Smith testified that she corroborated the life expectancy with Christina's treating physicians. (<u>Id.</u> at 6-78.) There has

been no testimony rebutting Ms. Smith's regarding life expectancy, and no testimony that Christina's injuries may render her life expectancy shorter than average. The Government has argued that Christina received "the full benefit from the surgery" and that it "improved her life expectancy." (Tr. 12-12.) Conversely, Plaintiffs' counsel has acknowledged that the Court may, based upon the evidence adduced at trial regarding Christina's myriad health problems, conclude that some reduction in life expectancy is appropriate. (Id. at 12-10-11.) During closing arguments, Plaintiffs' counsel suggested a ten percent reduction in life expectancy might be appropriate. The Court finds, however, that the only evidence specifically regarding life expectancy adduced at trial was the testimony of Ms. Smith. The Court therefore finds that Christina has a life expectancy of 82 years of age.

### CONCLUSIONS OF LAW

Having evaluated the factual aspects of Plaintiffs' claims, this Court will now further address the legal issues of the FTCA, vicarious liability, medical negligence, informed consent, and loss of filial consortium.

## I. The FTCA and Vicarious Liability

1. "Under the FTCA, the United States is liable for certain torts 'in the same manner and to the same extent as a private individual under like circumstances,' 28 U.S.C. § 2674,

'in accordance with the law of the place where the [alleged] act or omission occurred,' 28 U.S.C. § 1346(b)." <u>McMillan v. United States</u>, 112 F.3d 1040, 1043 (9th Cir. 1997) (alteration in original). Thus, for purposes of this lawsuit, the FTCA subjects the United States to suit insofar as a private individual, in this case a private hospital, would be subject to suit under Hawaii law. <u>See id.</u>

2. Hawaii law dictates that, "[u]nder the theory of respondeat superior, an employer may be liable for the negligent acts of its employees that occur within the scope of their employment." <u>Wong-Leona v. Hawaiian Indep. Refinery</u>, 879 P.2d 538, 543 (Haw. 1994). As such, the Government, through its operation of Tripler, is potentially subject to liability for the allegedly negligent acts of its employees, including but not limited to Dr. John Payne, who were acting within the scope of their employment in treating Christina. The Court therefore turns to Plaintiffs' claims against the Tripler providers.

## II.  Medical Negligence

3. In order to prevail on a medical malpractice claim, a plaintiff must prove the following elements by a preponderance of the evidence: (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) a failure on the dependent's part to conform to that standard, (3) a reasonably close causal connection between the conduct and the resultant injury, and (4)

actual loss or damage. Takayama v. Kaiser Found. Hosp., 923 P.2d 903, 915-16 (Haw. 1996) (quoting Knodle v. Waikiki Gateway Hotel, Inc., 742 P.2d 377, 383 (Haw. 1987)) (alteration in original); see also Bernard v. Char, 903 P.2d 676, 682 (Haw. 1995).

4. As to liability, "the established standard of care for all professionals is to use the same degree of skill, knowledge, and experience as an ordinarily careful professional would exercise under similar circumstances." Kahoʻohanohano v. Dep't of Human Servs., 178 P.3d 538, 572 (Haw. 2008). "[T]he standard of care for a claim based on allegedly negligent medical treatment must be established by reference to prevailing standards of conduct in the applicable medical community." Carr v. Strode, 904 P.2d 489, 499 n. 6 (Haw. 1995).

5. The standard of care, as well as any breach thereof, must generally be established through expert medical testimony. See Kahoʻohanohano, 178 P.3d at 572 ("[I]n medical malpractice actions, expert opinion is generally required to determine the 'degree of skill, knowledge, and experience required of the physician, and the breach of the medical standard of care.'" (quoting Exotics Hawaii-Kona, Inc. v. E.I. Du Pont de Nemours & Co., 172 P.3d 1021, 1044 (Haw. 2007))). "[I]t is generally not sufficient for a plaintiff's expert witness (i.e., one qualified in medicine, or dentistry, as the case may be) to testify as to what he or she would have done in treating a particular patient."

<u>Bernard</u>, 903 P.2d at 682. "The expert must go further and state that the defendant's treatment deviated from any of the methods of treatment approved by the standards of the profession." <u>Id.</u>

6. With respect to causation, "[i]n a medical malpractice action, a plaintiff must show with reasonable medical probability a causal nexus between the physician's treatment or lack thereof and the plaintiff's injury." <u>Craft</u>, 893 P.2d at 156 (citing <u>McBride v. United States</u>, 462 F.2d 72, 75 (9th Cir. 1972)).

7. In the case at bar, the Court finds and concludes that the standard of care in the applicable medical community was that a patient must have a BMI of 40 or above with no comorbidities, or 35 and above with comorbidities, in order to be eligible and an appropriate candidate for bariatric surgery. Thus, the standard of care required that the Tripler providers offer bariatric surgery to Christina only if she met this BMI criterion. The Court finds that Christina's surgeon and other medical providers knew or should have known, both on September 14, 2010 (the date of her preoperative meeting to schedule surgery) and on the date of surgery (September 27, 2010), that Christina had lost approximately 34 pounds through the LEAN program and therefore had a BMI of approximately 36, with no comorbidities. In light of this, the Court finds and concludes that Tripler breached the applicable standard of care by offering

and performing bariatric surgery on Christina on September 27, 2010, despite the fact that Tripler staff knew or should have known that Christina's BMI at the time of her preoperative meeting with Dr. Payne did not meet the BMI eligibility criterion established by the relevant medical community.

8. The Court has also found that, in addition to the BMI criterion, the standard of care for bariatric surgery required that a patient have failed in a formal weight loss program of some kind prior to being offered surgery. The Court finds and concludes that Tripler breached the applicable standard of care by offering and performing bariatric surgery on Christina on September 27, 2010, despite the fact that Tripler staff knew or should have known that Christina had never failed in a nonsurgical weight loss program of any kind as of the date she was screened for entry into the Tripler Bariatric Surgery Program. The Court notes that, on May 20, 2010, during her session with Andrew Ching, Christina stated "that in the past she ha[d] attempted to use diet pills as a way to lose weight." (Ex. 1008 at 000706.) Similarly, on September 8, 2010, Dr. Pena noted that Christina reported that "[d]espite previous attempts at weight loss in the past 8 years including exercise and Alli she began to consider having the gastric bypass surgery[.]" (Id. at 000706.) Nevertheless, as of March 30, 2010, when Christina was first enrolled in the Tripler Bariatric Surgery Program,

Christina's medical records made no mention of any prior weight loss attempts on her part. Further, the prior weight loss attempts that are noted (albeit rather vaguely) clearly do not suggest that Christina had ever participated in any sort of formal weight loss program prior to entering the Tripler Bariatric Surgery Program. Thus, at the time Christina enrolled in the Tripler Bariatric Surgery Program, she had no documented failed attempts in any formal, nonsurgical weight loss program. The Tripler providers therefore breached the standard of care by enrolling Christina in the Tripler Bariatric Surgery Program without conducting an adequate inquiry of her weight loss history and without confirming, based on that history, that she had, in fact, made documented prior attempts at weight loss through a nonsurgical program of some kind.

9. Moreover, the Court finds and concludes that Tripler breached the applicable standard of care by offering and performing bariatric surgery on Christina despite the fact that Tripler staff knew or should have known that Christina succeeded in losing approximately 34 pounds (approximately 15% of her body weight) through her participation in Tripler's LEAN Healthy Lifestyles Program, which (as discussed above) was the only nonsurgical weight loss program Christina had tried prior to surgery. The Court is mindful that Dr. Jones emphasized many times that 95% of obese people typically regain any weight they

may lose without surgical intervention. (Jones: 8-89-90.)
Nevertheless, given Christina's success in losing 34 pounds
through the LEAN program, and the evidence adduced at trial
supporting the LEAN program participants' ability to lose weight
and sustain such losses, the Court cannot find that any further
nonsurgical weight loss efforts on Christina's part would have
been "futile." (See Ex. J5.) Thus, Christina did not even meet
Tripler's own eligibility requirements, which state that a
patient must have failed "all medical weight loss options and
[feel] that any further non-surgical attempts would be futile."
(Id.) Indeed, Dr. Verschell testified that frequent and long-term
contact with a behavior modification program such as the LEAN
Healthy Lifestyles Program can be a successful, nonsurgical
method of preventing weight regain. (Verschell: 10-182-183.)
Moreover, the NIH Consensus Statement noted that "[t]he
possibility should not be excluded that the highly motivated
patient can achieve sustained weight reduction by a combination
of supervised low-calorie diets and prolonged, intensive behavior
modification therapy." (Ex. J4 at 4.) The Court therefore finds
and concludes that, in accordance with the standard of care in
the applicable medical community, Christina's obvious success in
losing weight through the LEAN program disqualified her from
weight loss surgery on September 27, 2010. The Tripler providers
therefore breached the standard of care by offering Christina

75

bariatric surgery even after her demonstrated success in a
nonsurgical weight loss program.

10. Thus, the Court finds and concludes that Tripler
breached the applicable standard of care by offering and
performing Roux en Y gastric bypass surgery on Christina on
September 27, 2010. The Court further finds that Tripler's breach
of the applicable standard of care proximately and legally caused
Christina to undergo Roux en Y gastric bypass surgery on
September 27, 2010, resulting in the severe and debilitating
complications and injuries set forth herein. The Court therefore
finds in favor of Plaintiffs, based upon the preponderance of the
evidence, as to the medical negligence claim.

## III. Informed Consent

Because the Court has determined that Tripler breached
the applicable standard of care by offering bariatric surgery to
Christina on September 27, 2010, it need not reach the issue of
whether Tripler also breached the requirement that it obtain
Christina's informed consent prior to surgery. Nevertheless, for
the purpose of providing a complete record, and in the
alternative, the Court provides the following conclusions of law
regarding the issue of informed consent.

11. In Hawaii, failure to obtain informed consent
establishes a separate cause of action sounding in tort. Haw.
Rev. Stat. § 671-1.

12. To establish a claim of negligent failure to obtain informed consent under Hawaii law, the plaintiff must demonstrate by a preponderance of the evidence that: (1) the physician owed a duty to disclose the risk of one or more of the collateral injuries that the patient suffered; (2) the physician breached that duty; (3) the patient suffered injury; (4) the physician's breach of duty was a cause of the patient's injury in that (a) the physicians treatment was a substantial factor in bringing about the patient's injury and (b) a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the plaintiff patient been properly informed; and (5) no other cause is a superseding cause of the patient's injury. <u>Barcai v. Betwee</u>, 50 P.3d 946, 959–60 (Haw. 2002) (citing <u>Bernard v. Char</u>, 903 P.2d 667, 670, 676 (Haw. 1995)).

13. Physicians have a duty to reasonably inform patients regarding those items set forth in Haw. Rev. Stat. § 671-3:

> (1) The condition to be treated;
> (2) A description of the proposed treatment or procedure;
> (3) The intended and anticipated results of the proposed treatment or procedure;
> (4) The recognized alternative treatments or procedures, including the option of not providing these treatments or procedures;
> (5) The recognized material risks of serious complications or mortality associated with:
>     (A) The proposed treatment or procedure;
>     (B) The recognized alternative treatments or

procedures; and
(C)   Not undergoing any treatment or
procedure; and
(6)   The recognized benefits of the recognized
alternative treatments or procedures.

14. Hawaii courts have adopted the patient-oriented standard for determining whether particular information must be disclosed to a patient. Ray v. Kapiolani Med. Specialists, 259 P.3d 569, 583 (Haw. 2011). Under the patient-oriented standard, the scope of a physician's duty of disclosure is measured by what a reasonable patient would need to know in order to make an informed and intelligent decision regarding proposed medical treatment. Id.

15. As noted above, the Tripler staff, including Dr. Payne, advised Christina that she would regain the weight she lost through the LEAN Healthy Lifestyles Program if she did not have bariatric surgery, with Dr. Payne telling Christina that she would likely regain the weight even if she continued in the LEAN program. (Christina: 5-67-68; Payne: 2-191; Ball (Ex. 353) at 37-38, 47-48; Plackett: 10-12-14.) Indeed, the informed consent form Christina signed expressly stated that a risk of not having the surgery was that "sustained weight loss is usually not attained." (Ex. 1004 at 000475.) This was despite the fact that this alleged risk is not factored into the analysis regarding the appropriateness of surgery adopted by the NIH, SAGES, ASMBS, or Tripler itself. (See generally Ex. J4 (NIH Consensus Statement);

Ex. 1029 (ASMBS Guidelines); Ex. 1031 (SAGES Guidelines); <u>see also</u> Ex. Ex. 121 (Ernsberger Report) at 11.)

Moreover, there was strong testimony, including from Dr. Verschell, the head of the LEAN program, that frequent and long-term contact with a behavior modification program such as the LEAN Healthy Lifestyles Program can be a successful, nonsurgical method of preventing weight regain. (Verschell: 10-182-183.) Indeed, Dr. Verschell testified that Christina lost weight and learned and practiced behaviors in the LEAN Healthy Lifestyles Program that would allow her to keep off the weight. (<u>Id.</u> at 12-86.) Dr. Verschell testified that he would never tell a patient that she would likely regain all the weight she had lost through the LEAN program without surgery, and Andrew Ching and Yvette Williams both echoed this testimony. (Verschell: 12-88-89; Ching: 2-85; Williams: 1-102-103.) Based on all of the evidence before it, the Court finds and concludes that, under the circumstances of this case, it was a breach of the standard of care for Tripler staff to advise Christina that she would invariably regain the weight she had lost through the LEAN Healthy Lifestyles Program if she did not go forward with surgery.

16. The Court also finds and concludes that the approach taken by the Tripler Bariatric Surgery Program, wherein Christina was never provided with advice or a recommendation that

she should postpone her gastric bypass surgery in light of her
nonsurgical weight loss and the drop in her BMI, failed to
adequately apprise Christina of information that a reasonable
patient would need to make an informed decision regarding
bariatric surgery. Specifically, the BMI patient eligibility
criterion reflects a consensus by the medical community that the
risks of bariatric surgery outweigh its benefits if it is
performed on a patient whose BMI falls below 40 and who has no
comorbidities. In light of this consensus, Tripler staff were
required to recommend that Christina cancel or at least delay
bariatric surgery when she successfully lost weight through the
LEAN Healthy Lifestyles Program and her BMI fell below 40.
Indeed, when Christina lost weight through the LEAN Healthy
Lifestyles Program and no longer met the BMI criterion for
surgery eligibility, the standard of care required the Tripler
providers to deny her bariatric surgery until such time as she
might fail to sustain the weight losses she achieved through the
LEAN program. The Court finds that Tripler failed to do so. The
Roux en Y gastric bypass surgery is a serious and delicate
operation, involving the rearrangement of Christina's digestive
system and results in an overall complication rate of 20%; yet,
the Tripler providers failed to give Christina any recommendation
as to the appropriateness of surgery, and did not provide all of
the information necessary for her to make her own informed

decision about whether to go forward.

17. In sum, the Court finds that Christina was not provided with sufficient, accurate information such that she was able to give informed consent to the gastric bypass surgery performed on September 27, 2010. The Court further finds that a properly informed, reasonable person in Christina's position would not have consented to the gastric bypass surgery that led to her injuries. The Court therefore finds in favor of Plaintiffs, based on the preponderance of the evidence, as to the informed consent claim.

## IV. Negligent Infliction of Emotional Distress as to N.M.

18. The Hawaii Supreme Court has determined that a plaintiff may recover for negligent infliction of emotional distress ("NIED"), absent any physical manifestation of his psychological injury or actual physical presence within a zone of danger, where "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case . . . . Thus, an NIED claim is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed utilizing ordinary negligence principles." Kaho'ohanohano v. Dep't of Human Serv., 178 P.3d 538, 582-83 (Haw. 2008) (internal citations omitted).

19. The Court finds and concludes that Plaintiffs have failed to put on any evidence demonstrating the requisite degree

of emotional distress on the part of N.M. N.M. did not testify at trial, and there was sparse testimony from other witnesses suggesting that a reasonable person in N.M.'s position would not be able to adequately cope with the mental stress engendered by his mother's medical complications. The Court therefore concludes that Plaintiffs have failed to prove their NIED claim.

## V.    Loss of Parental Consortium

20. What remains is Christina's claim, on behalf of N.M., for loss of parental consortium. "Loss of filial consortium is a recognized cause of action in Hawaii under [the state's] wrongful death statute, Hawaii Revised Statutes (HRS) § 663-3." Masaki v. Gen. Motors Corp., 780 P.2d 566, 576 (Haw. 1989). Likewise, this district court has found that the similar cause of action for loss of parental consortium also exists under Hawaii law. Marquardt v. United Airlines, Inc., 781 F. Supp. 1487, 1492 (D. Haw. 1992). Loss of consortium is a derivative claim, which means that a claim by a child for loss of consortium is derivative of the damages to the parent. See, e.g., Omori v. Jowa Haw. Co., 981 P.2d 703, 703 (Haw. 1999).

21. Here, the Court finds and concludes that the injuries and complications Christina suffered as a consequence of the Roux en Y gastric bypass surgery have caused some disruption and injury to her relationship with her son, N.M. Christina testified that N.M. was visiting over the summer during the time

she was in the hospital because of complications from her surgery. (Christina: 5-103-104.) She further testified that she can no longer take care of N.M., and that he now has to take care of her sometimes, helping her when she's sick and getting her her medicine. (Id. at 5-104.) In light of the severe complications Christina suffered and her partial and permanent disability, as a proximate and legal result of Tripler's negligence, Plaintiff N.M. is entitled to recover general damages for his past and future loss of parental care, companionship, society, comfort, and protection in the amount set forth below.

**VI. Damages**

22. Hawaii law governs the elements and measures of damages to be awarded in this case. See Shaw v. United States, 741 F.2d 1202, 1205 (9th Cir. 1984).

23. The Court has reviewed the Life Care Plan prepared by Kathy Smith, R.N., which was reviewed and approved by Dr. Leitman and Christina's current treating physicians. The Court also reviewed the Life Care Plan prepared by John Fountaine, the Government's life care plan expert; however, the Court finds the Life Care Plan prepared by Ms. Smith to be far more detailed, thorough, and reflective of Christina's actual needs. In addition, the Court has heard and considered the testimony of Ms. Smith and Dr. Leitman regarding Christina's future life care needs, as well as the testimony of defense witnesses concerning

these issues. The Court finds and concludes that the elements of the Life Care Plan prepared by Ms. Smith are reasonably and necessarily required as a result of the gastric bypass surgery, and that the costs for the goods and services as specified in the Life Care Plan are reasonable. (<u>See</u> Ex. 127.)

24. As a proximate and legal result of Tripler's negligence, Christina is entitled to recover economic damages for her future life care expenses. The Court must consider both the inflation rate and the discount rate when computing the present value of an award when competent evidence is presented on each. <u>See</u> <u>Alma v. Mfrs. Hanover Trust Co.</u>, 684 F.2d 622 (9th Cir. 1982). The Court has reviewed the economic analysis prepared by Dr. Tom Loudat, and has heard and considered the testimony provided by Dr. Loudat regarding the economic analysis. The Court finds that Dr. Loudat's present value calculations of Christina's future life care costs, based on Ms. Smith's Life Care Plan, are based on a reliable methodology and are accurate. Accordingly, the Court finds that Christina is entitled to compensation in the amount of $1,874,240 representing the present value of her future life care needs resulting from the Roux en Y gastric bypass surgery. (Ex. 377.)

25. As a proximate and legal result of Tripler's negligence, Christina is entitled to recover economic damages for her loss of income. The Court must discount past and future lost

income to reflect lost wage income after both state and federal taxes have been deducted. See Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 536 (1983); Shaw, 741 F.2d at 1205. The Court finds and concludes that Christina has been at least partially disabled as a result of the Roux en Y gastric bypass surgery. Prior to undergoing surgery, Christina was enrolled in an Associates degree program, and had an occupational objective of a career in Healthcare Administration. At the time of her surgery, she had one year remaining to complete the program. Dr. Loudat testified that Christina's estimated retirement age is 63. The Government introduced scant evidence disputing Christina's claimed lost earnings, or Christina's assertion that, but for the surgery, she would have attained her Associates degree and started a career in Healthcare Administration. The Court therefore finds that, but for the surgery and Christina's resultant injuries, she would have completed her Associates degree in August 2011 and commenced working in Healthcare Administration in the beginning of 2012. As such, the Court finds that Dr. Loudat's present value calculations of Christina's probable lost earnings resulting from her disability are reasonable. The Court therefore awards compensation for Christina's lost past earnings in the amount of $84,519, and for her lost future earnings in the amount of $816,548.

26. As a proximate and legal result of Tripler's

negligence, the Court concludes that Christina is entitled to recover general damages in the amount of the statutory maximum pursuant to Haw. Rev. Stat. § 663-8.7 of $375,000 for her actual physical pain and suffering, and a total of $1,000,000 for her past and future loss of enjoyment of life, her mental anguish and emotional distress, her disfigurement, and her loss of past and future filial care and companionship.

27. As a proximate and legal result of Tripler's negligence, N.M. is entitled to recover general damages for his past and future loss of parental care, companionship, society, comfort, and protection in the amount of $100,000.

28. Plaintiffs may recover their costs, and shall file with the magistrate judge within fourteen days from the date of this decision the necessary affidavits to resolve the question of costs.

29. Sovereign immunity bars an award of attorneys' fees against the United States unless a statute expressly authorizes such an award. The FTCA does not contain any such express waiver. See Anderson v. United States, 127 F.3d 1190, 1191-92 (9th Cir. 1997). Thus, Plaintiffs are not entitled to an award of attorneys' fees in the instant suit.

## DECISION

And now, following the conclusion of a bench trial in this matter, and in accordance with the foregoing findings of

facts and conclusions of law, it is hereby ordered that judgment shall enter in favor of Plaintiffs and against the United States in the above matter in the amount of $4,150,307 to Plaintiff Christina Mettias, and $100,000 to Plaintiff Christina Mettias as next friend of her minor son, N.M.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 21, 2015



_____

Alan C. Kay
Senior United States District Judge

Mettias v. United States, Civ. No. 12-00527 ACK KSC, Findings of Fact, Conclusions of Law, and Decision.

87